court would have examined whether those policies rose to the level of deliberate indifference.[198] Finally, the plaintiff would have difficulty showing the required causal nexus between his injury and the alleged deficient training, supervision, or failure to discipline.[199]

Similar problems would have arisen in *Jones v. City of Chicago*, where the police had a custom of maintaining "street files" containing exculpatory evidence that were never released to the state attorney.[200] While Jones was able to prove to the jury that this particular "custom" was "department-wide and of long standing," it is unlikely he could have shown that the Department had a written policy authorizing street files, or that an unwritten policy had been authorized by a final policymaker.[201] Jones also would not have prevailed under a "failure to [blank]" theory, because the unconstitutionality of this clandestine system should have been, "plainly obvious" to all police officers, so any "failure to train" could not have caused the challenged deprivations.

The post-*Monell* "custom" cases provide a glimpse into the dormant power of § 1983 to attack the unwritten codes of conduct that underlie official misconduct. To appreciate the potency of the "custom" provision, it is necessary to look beyond fringe police practices, such as the use of "street files" in *Jones v. City of Chicago*. The unwritten codes of conduct addressed by the 1871 statute find their modern day equivalent in a pervasive, unwritten code adhered to by officials in contemporary law enforcement organizations—the "police code of silence."

## IV. THE "CUSTOM" OF THE POLICE CODE OF SILENCE

The police "code of silence" is a well-documented phenomenon.[202]

---

[198] *See, e.g.*, Liebe v. Norton, 157 F.3d 574, 579 (8th. Cir. 1998) (stating that a county's policy "cannot be both an effort to prevent suicides and, at the same time, deliberately indifferent to suicide"). *See also supra* text accompanying notes 116-18 (providing detailed analysis of *Liebe v. Norton*).

[199] *See, e.g.*, City of Canton v. Harris, 489 U.S. 378, 389 (1989) (stating that, although respondent has identified a deficiency in a police training program, she "must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs"); Board of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 412 (1997) ("The connection between the background of the [officer inadequately screened] and the specific constitutional violation alleged must be strong."). *See also supra* notes 120-25 and accompanying text (providing analysis of *Brown* under "failure to screen applicants" model).

[200] *See* Jones v. City of Chicago, 856 F.2d 985, 989 (7th. Cir. 1988).

[201] *Id.*

[202] *See, e.g.*, Joel Berger, *See-No-Evil Officers Should Pay*, N.Y. TIMES, Aug. 24, 1997, at A13 (noting documentation of New York Police Department's failure to "adequately punish officers who blatantly lied to protect other officers charged with brutality"); Jeff Gammage, *Code of Silence: A Barrier to Truth in Investigations of Police*, PHILA. INQUIRER, May 5, 1996, at E1 (citing examples where police officers refused to report the criminal behavior of other officers); Jose Martinez, *'Blue Wall' Stymies Cop-Beating Probe; 'Blue Wall' of Silence Thwarts Probe Into Cox Beating*, BOS. HERALD, Jan. 28, 2000, at



Exhibit "1"

Generally, the code of silence refers to the refusal of a police officer to "rat" on fellow officers, even if the officer has knowledge of wrongdoing or misconduct. The code of silence has existed, to varying degrees, for as long as there have been organized police forces[203]—from the New York Police under the notoriously corrupt Boss Tweed gang of the 1840s,[204] to the wave of

---

A1 (citing U.S. Attorney's explanation that a "sustained code of Silence" among Boston police thwarted investigation into police beating of a black fellow officer and outlasted the statute of limitations for bringing federal charges); Joseph D. McNamara, *Has the Drug War Created an Officer Liars' Club?*, L.A. TIMES, Feb. 11, 1996, at M1 (noting recent perjury scandals in police departments in Los Angeles, Boston, New Orleans, San Francisco, Denver, New York, and other large U.S. cities); Joyce Purnick, *The Blue Line Between Rat and Right*, N.Y. TIMES, Oct. 10, 1996, at B1 (reporting that an officer "put herself in harms way" by "breaching the 'blue wall of silence'"); Selwyn Raab, *The Unwritten Code that Stops Police from Speaking*, N.Y. TIMES, June 16, 1985, at B4 (citing testimony of Commissioner Ward acknowledging the code of silence as "an old tradition" in all police forces).

[203] *See* Carol Streiker, *Second Thoughts About First Principles*, 107 HARV. L. REV. 820, 835 (1994) ("Despite widespread and frequent complaints about police corruption . . . [t]he lack of effective regulation and concomitant corruption have persisted throughout the twentieth century."); *see also* THOMAS J. DEAKIN, POLICE PROFESSIONALISM: THE RENAISSANCE OF AMERICAN LAW ENFORCEMENT 200-215 (1988).

[204] *See generally* SEYMOUR MANDELBAUM, BOSS TWEED'S NEW YORK (1965) (detailing rampant corruption throughout New York City political structure). The New York City Police Department has been rocked by a major corruption scandal approximately every 20 years, as evidenced by the numerous commissions convened to investigate the department. *See, e.g.*, REPORT OF THE SENATE COMMITTEE APPOINTED TO INVESTIGATE THE POLICE DEPARTMENT OF THE CITY OF NEW YORK 30 (Jan. 18, 1895) [hereinafter LEXOW COMMISSION REPORT] (Senator Clarence Lexow, Chair) (reporting that, between January 1, 1891, to May 1, 1894, twelve officers were convicted of criminal neglect of duty; twelve of oppression; one each of indecent exposure, burglary and attempt at rape; fifty-six of assault in the third degree; and forty-five of assault in the second degree); REPORT OF THE SPECIAL COMMITTEE OF THE BOARD OF ALDERMAN OF THE CITY OF NEW YORK APPOINTED AUGUST 5, 1912 TO INVESTIGATE THE POLICE DEPARTMENT (June 10, 1913) 6 [hereinafter CURRAN COMMISSION REPORT] (Henry H. Curran, Chair) (reporting that "practically all of the proprietors of gambling and disorderly houses in the City have been compelled to make regular monthly payments to certain members of the Police Department"); FINAL REPORT OF SAMUEL SEABURY, REFEREE, IN THE MATTER OF THE INVESTIGATION OF THE MAGISTRATE'S COURTS IN THE FIRST JUDICIAL DEPARTMENT AND THE MAGISTRATES THEREOF, AND OF ATTORNEYS AT LAW PRACTICING IN SAID COURTS 80-96 (Mar. 28, 1932) [hereinafter SEABURY REPORT] (Samuel Seabury, Referee) (detailing police "frame-ups" and providing several examples); EDWARD S. SILVER, REPORT OF SPECIAL INVESTIGATION BY THE DISTRICT ATTORNEY OF KINGS COUNTY AND THE DECEMBER 1949 GRAND JURY, DECEMBER 1949 TO APRIL 1954 9-13 (January 8, 1955) (citing several examples of corruption, including police involvement in substantial gambling operations at Brooklyn College); REPORT OF THE COMMISSION TO INVESTIGATE ALLEGATIONS OF POLICE CORRUPTION AND THE CITY'S ANTI-CORRUPTION PROCEDURES (Dec. 26, 1972) 83-84 [hereinafter KNAPP COMM'N REPORT] (Whitman Knapp, Chair) (describing practice of phony arrests to satisfy quotas); *see also* William Murphy & Leonard Levitt, *It's Blue Deja*

corruption that spread through urban police forces in the 1970s.[205]

Historically, the code of silence protected the traditional corruption racket.[206] Today, the code of silence protects officers who violate civil rights through violence and other misconduct.[207] The 1980s and 90s have brought to light a new and more invidious code of silence, typified by the high-profile cases of Rodney King[208] and Abner Louima.[209] City governments are aware of

---

Vu: New Scandal Reads Like Old Police Stories, N.Y. NEWSDAY, June 21, 1994 at 7 (discussing the similarities and differences between corruption scandals revealed by the various commissions from 1894 to the present).

[205] See, e.g., United States v. Philadelphia, 644 F.2d 187 (3d Cir. 1980) (dismissing case where entire Philadelphia police force indicted for suppressing evidence that inculpates police officers); see also Charles R. Babcock, Justice Accuses Philadelphia of Police Abuses, WASH. POST, Aug. 14, 1979, at A1 (noting that the "police department's practices of abuse were directed at all persons but were especially harmful to the rights of blacks and Hispanics"); In Chicago in the 70s, a six-year investigation of the police department led to over 60 prison sentences and uncovered a long-standing relationship between the police, organized crime and city government involving bribery, extortion, conspiracy, and perjury. See CONTROL IN THE POLICE ORGANIZATION 23-4 (Maurice Punch ed., 1983). And in New York City, a major inquiry conducted by the Knapp Commission in 1972 uncovered institutionalized corruption throughout the police department, mainly involving officers taking bribes to allow gamblers, prostitutes, and others to avoid arrest. In the Commission's words, "[t]he tradition of the policeman's code of silence is so strong . . . that it was futile to expect testimony [regarding corrupt activities] from any police officer." KNAPP COMM'N REPORT, supra note 204, at 47.

[206] See generally Hon. Harold Baer, Jr. & Joseph P. Armao, The Mollen Commission Report: An Overview, 40 N.Y.L. SCH. L. REV. 73, 76 (1995) ("Gambling, prostitution and other vice rackets are no longer the springboard to a career of corruption in the Police Department as they were in times gone by. Corrupt cops. . .now actively engage in criminal activity.").

[207] See id.

[208] The Rodney King incident implicates the police code of silence because it was carried out with an attitude of impunity: the officers were apparently so certain that they would suffer no recrimination for this assault that they communicated their actions to other officers via official police radios, and even bragged to medical personnel caring for King that they had inflicted the injuries he sustained. Victim's Account of Police Beating, L.A. TIMES, March 7, 1991, at A21. See Martin Berg, Now, Time for the Real Thing: Trial in Rodney King Beating Set to Start, L.A. DAILY J. (Feb. 3, 1992) (reporting that a police officer defendant in the Rodney King trial was charged as an accessory after the fact for concealing his conduct and that of other officers under his command).

[209] See Berger, supra note 202 (responding to outrage over "nest of perjury" in Louima incident, Mayor Giuliani ordered all officers to spend several hours in discussion groups); see also Dan Barry, Officers' Silence Still Thwarting Torture Inquiry, N.Y. TIMES, Sept. 5, 1997 at A1 (noting that of 100 officers granted limited immunity in Louima torture case, approximately 12 are expected to have knowledge of the incident, and only two have provided valuable information); Claude Lewis, Fallout From the Brooklyn Torture Case, THE RECORD, Sept. 9, 1997 at L13 (noting that officers fear that bystanders, remembering "blue wall of silence" encountered in Louima case, will refuse to offer assistance when

66         *BOSTON UNIVERSITY LAW REVIEW*         [Vol. 80:17

this growing problem, as evidenced by the many commissions and task forces convened in major cities over the past decade to analyze the root causes of police brutality and misconduct. For example, a 1994 Report on the New York City Police Department uncovered evidence that police corruption has flourished, in part, "because of a police culture that exalts loyalty over integrity [and] the silence of honest officers who fear the consequences of 'ratting' on another cop no matter how grave the crime."[210] Similarly, the Los Angeles commission convened in the wake of the Rodney King incident identified a pervasive "officer code of silence," described by one officer as "a non-written rule that you do not roll over, tell on your partner, your companion."[211] Detailed reports studying the code of silence have discussed its impact on police culture and the public perception of police officers.[212]

Commission reports on corruption and brutality only begin to describe the

---

routine arrests present unforeseen trouble); *see also supra* note 6, and accompanying text (providing additional details surrounding the torture of Abner Louima by New York City police officers).

[210] REPORT OF THE COMMISSION TO INVESTIGATE ALLEGATIONS OF POLICE CORRUPTION AND THE ANTI-CORRUPTION PROCEDURES OF THE POLICE DEPARTMENT 1 (July 7, 1994) [hereinafter MOLLEN COMMISSION REPORT] (Milton Mollen, Chair).

[211] REPORT OF THE INDEPENDENT COMMISSION ON THE LOS ANGELES POLICE DEPARTMENT 169 (1991) [hereinafter CHRISTOPHER COMMISSION REPORT].

[212] *See, e.g.*, WICKERSHAM REPORT, *supra* note 1; 1961 U.S. COMM'N ON CIVIL RIGHTS REPORT, *supra* note 2, at 6-12 (detailing two examples of police brutality where the state's power to punish criminal behavior "may be blocked ... by the fact that the potential defendant is the person who must start up the machinery of the criminal law"; PRESIDENT'S COMMISSION ON LAW ENFORCEMENT AND THE ADMINISTRATION OF JUSTICE, TASK FORCE REPORT: THE POLICE (1967) [hereinafter PRESIDENT'S COMMISSION ON LAW ENFORCEMENT]; REPORT OF THE NATIONAL ADVISORY COMMISSION ON CIVIL DISORDERS 162 (1968) [hereinafter 1968 KERNER COMMISSION REPORT] (arguing that one possible source of Negro hostility to police is the lack of effective complaint mechanisms evidenced by the fact "that policemen in some cities have little fear of punishment for using unnecessary force because they appear to have a degree of immunity from their departments); U.S. COMMISSION ON CIVIL RIGHTS, WHO IS GUARDING THE GUARDIANS? 50 (1981) [hereinafter 1981 U.S. COMMISSION ON CIVIL RIGHTS REPORT] (noting that citizens' complaints are valuable because the code of silence often prevents internal police command from learning about important problems); U.S. DEPARTMENT OF JUSTICE, POLICE INTEGRITY: PUBLIC SERVICE WITH HONOR (1997) [hereinafter POLICE INTEGRITY REPORT]; HUMAN RIGHTS WATCH REPORT, *supra* note 12, at 68-71 (stating that the Mollen Commission found the code of silence strongest in New York City's most dangerous neighborhoods, and that one officer, admitting to corrupt and brutal practices, never feared he would be turned in by another officer); POLICE BRUTALITY AND EXCESSIVE FORCE IN THE NEW YORK CITY POLICE DEPARTMENT 4 (Amnesty International 1996) [hereinafter AMNESTY INT'L REPORT] (citing Mollen Commission and finding that senior officers practice "a deliberate 'blindness' to corruption"); N.Y.C COMMISSION ON HUMAN RIGHTS, BREAKING THE US V. THEM BARRIER: A REPORT ON POLICE/COMMUNITY RELATIONS (1993) [hereinafter BREAKING US V. THEM BARRIER].