**Page 1**

```
1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF HAWAII

3   OFELIA COLOYAN,
                                )CIVIL NO. CV03-476 KSC
4           Plaintiff,          )
                                )
5   vs.                         )
                                )
6   WILLIAM P. BADUA; JEFFREY OMAI; )
    SPENCER ANDERSON; NEIL PANG; and )
7   DOES 5-10,                  )
                                )
8           Defendants.         )
    _____ )
9

10          DEPOSITION OF BYRON ELIASHOF, M.D.

11  Taken on behalf of the Defendants at 615 Piikoi Street,

12  Suite 1509, Honolulu, Hawaii, commencing at 2:35 p.m. on

13  February 23, 2006, pursuant to the Federal Rules of Civil

14  Procedure.

15

16  BEFORE:    SHEILA BRITT LIPTON, CSR NO. 257
               Notary Public, State of Hawaii
17

18
    H O N O L U L U   R E P O R T I N G   S E R V I C E S
19
20      1000 Bishop Street, Suite 401
            Honolulu, Hawaii 96813
21
            (808) 524-6288
22

23

24

25

            HONOLULU REPORTING SERVICES
```

**Page 2**

```
1   APPEARANCES:

2   For the Plaintiff:    JACK SCHWEIGERT, ESQ.
                          550 Halekauwila Street
3                         Room 309
                          Honolulu, Hawaii 96813
4

5   For the Defendants:   MARIE MANUELE GAVIGAN, ESQ.
                          KENDRA K. KAWAI, ESQ.
6                         Deputies Corporation Counsel
                          City & County of Honolulu
7                         530 South King Street
                          Honolulu, Hawaii 96813
8

9   Videographer:         Dina Davenport

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
            HONOLULU REPORTING SERVICES
```

**Page 3**

I N D E X

|  | Page |
|---|---|
| EXAMINATION BY: | |
| Ms. Kawai | 4 |
| Mr. Schweigert | 43 |
| | |
| Voir Dire by Mr. Schweigert | 11 |

EXHIBITS MARKED FOR IDENTIFICATION:

| | |
|---|---|
| Exhibit 1 | 17 |
| Exhibit 2 | 60 |

HONOLULU REPORTING SERVICES

**Page 4**

1   (Whereupon the disclosure was presented to counsel.)

2

3       BYRON ELIASHOF, M.D.,

4   called as a witness by and on behalf of the Defendants,

5   having been first duly sworn, was examined and testified

6   as follows:

7

8       EXAMINATION

9   BY MS. KAWAI:

10  **Q.**    Good afternoon, Doctor. Could you please state

11  your name and address, business address, for the record.

12  **A.**    **My name is Byron A. Eliashof. My address is**

13  **Suite 1509, 615 Piikoi Street, Honolulu, Hawaii.**

14  **Q.**    Are you a resident of Honolulu?

15  **A.**    **Yes.**

16  **Q.**    What is your profession?

17  **A.**    **I'm a psychiatrist.**

18  **Q.**    What is your educational background?

19  **A.**    **I have an undergraduate degree from Yale**

20  **University, graduated in 1956, majoring in history. I**

21  **attended the Albert Einstein College of Medicine in New**

22  **York, graduated in 1961. After that I took an internship**

23  **in pediatrics at New Haven Medical Center. Following that**

24  **I took a residency in psychiatry at the Harvard Medical**

25  **School.**

HONOLULU REPORTING SERVICES

EXHIBIT "A"

**Page 5**

1  Q.  As a result what degrees did you earn?

2  A.  I have an M.D. degree, Doctor of Medicine. And

3  after I completed my residency I did additional study, and

4  passed the necessary examinations so that I am board

5  certified in psychiatry and neurology, emphasizing

6  psychiatry.

7  Q.  Do you hold any licenses?

8  A.  My license to practice medicine is in the state

9  of Hawaii.

10  Q.  When did you first obtain your license to

11  practice in the state of Hawaii?

12  A.  I obtained my license in 1965.

13  Q.  And currently is your license still active --

14  A.  Yes.

15  Q.  -- in the state of Hawaii?

16  Beyond medical school have you had any other

17  particular training?

18  A.  In addition to the years of studying psychiatry,

19  I've had many other courses, seminars, workshops, reading,

20  study groups. I think that covers it.

21  Q.  Do you have any special interest in psychiatry?

22  A.  I am in the general practice of psychiatry. My

23  interest has varied over the years. At the present time I

24  treat patients with a variety of disorders, mainly the

25  spectrum of anxiety and depression and adjustment

HONOLULU REPORTING SERVICES

**Page 7**

1  Q.  And you mentioned that part of your practice is

2  treating patients. Can you go into a little bit more

3  detail what is the nature of your practice?

4  A.  The practice at the present time focuses on

5  adults. I started off working with children and

6  adolescents. And over the years my interest changed and

7  moved toward, more toward adolescents and now adults.

8  If I think of some of the patients I'm treating

9  now, they are either suffering from depression or anxiety

10  or they have a phobic disorder, or they have an obsessive

11  compulsive disorder, or they might have a bipolar manic

12  depressive type disorder. These are the kinds of

13  diagnostic categories. I don't know if that answers your

14  question.

15  Q.  Yes, it does. Thank you.

16  Have judges qualified you as an expert in any

17  particular field?

18  A.  Yes. In the area of forensic psychiatry.

19  Q.  And how many times have you been qualified as an

20  expert in forensic psychiatry?

21  A.  I would estimate maybe 200 times.

22  Q.  And these judges that qualified you as an expert,

23  were they all within the Hawaii state -- or the Hawaii

24  court system?

25  A.  Yes.

HONOLULU REPORTING SERVICES

**Page 6**

1  problems, and also chronic pain. I also have an interest

2  in forensic psychiatry. And my focus there is primarily

3  on psychiatric injury or psychiatric impairments and

4  disability.

5  Q.  Could you explain to us what forensic psychiatry

6  is?

7  A.  It's the area where psychiatry and the law

8  intersect. And there are many areas where there is an

9  overlap. An example would be this case, where Ms. Coloyan

10  is alleging a psychiatric injury as a result of an

11  incident that occurred.

12  Sometimes there is instances where someone has

13  had a physical injury, such as a back injury, and they

14  develop psychiatric problems as a result of that.

15  Sometimes it's a more dramatic injury, such as someone

16  being held up in a bank, being threatened with a gun.

17  These are the areas that I do most of my work in.

18  Other areas where the law and psychiatry

19  intersect are, for instance, testamentary capacity,

20  competence to stand trial. Competence apparent in divorce

21  issues. In a variety of other kinds of issues. Issues of

22  psychiatric malpractice.

23  Q.  How long have you been doing forensic psychiatry?

24  A.  About 25 years. This has been part of my

25  practice.

HONOLULU REPORTING SERVICES

**Page 8**

1  Q.  Have you testified in court as an expert in the

2  field of forensic psychiatry?

3  A.  Yes.

4  Q.  Approximately how many times?

5  A.  About 80 to 90, 80 to 100 times.

6  Q.  Where has your testimony taken place?

7  A.  It's been in the circuit court, in the district

8  court, in the federal court, and the Department of Labor

9  at the appeals board.

10  Q.  And have you -- Let me take a step back. Are

11  these for civil or criminal matters or both?

12  A.  They have been almost all for civil matters.

13  There have been very few criminal matters that I've

14  testified on.

15  Q.  And for the civil matters have you testified for

16  plaintiff or defendant or both?

17  A.  I've testified for both. I would say that the

18  breakdown would be about 80 percent for the defense and

19  about 20 percent for plaintiffs.

20  Q.  What associations do you hold a membership?

21  A.  I belong to the Hawaii Psychiatric Medical

22  Association, the American Academy of Psychiatry and the

23  Law, the American Association of Disability Evaluating

24  Physicians, and the Hawaii Medical Society, and also the

25  Honolulu County Medical Society.

HONOLULU REPORTING SERVICES

1  Q.  Do you attend any seminars?

2  A.  **Yes.**

3  Q.  And what type of seminars do you attend?

4  A.  **The seminars vary. Some of them are on clinical**

5  **topics such as depression, bipolar disorder, treatment of**

6  **phobic disorders. And some of them focus on forensic**

7  **issues such as evaluation of plaintiffs, claimants,**

8  **assessment of credibility. These are the kinds of issues**

9  **that my seminars have addressed.**

10  Q.  What professional journals, magazines, or other

11  periodicals do you read on a regular basis as part of your

12  profession?

13  A.  **I read the American Journal of Psychiatry, the**

14  **Annals of Psychiatry, the Archives of Psychiatry, the**

15  **Journal of the American Academy of Psychiatry and the Law.**

16  **And then there's a variety of other secondary periodicals**

17  **that I also read.**

18  Q.  Do you regularly read any such publications

19  regarding forensic psychiatry?

20  A.  **The only one that I read in that area regularly**

21  **is the Journal of the American Psychiatry and the Law.**

22  Q.  Have you written any such articles on forensic

23  psychiatry?

24  A.  **The articles that I've written in the area of**

25  **psychiatry have to do with the topics of stress and pain**

---

10

1  disorders.

2  Q.  And the areas you've just discussed, would they

3  cover regarding emotional and mental disturbances?

4  A.  **Yes. I have them listed in my curriculum vitae**

5  **if you want to look at the titles.**

6  Q.  In your work as a forensic psychiatrist do you

7  consult with plaintiffs and defendants?

8  A.  **Yes.**

9  Q.  Can you give a percentage of times that you

10  consulted for plaintiffs?

11  A.  **I would break that down to be about 20 percent of**

12  **the time.**

13  Q.  And for defendants?

14  A.  **About 80 percent.**

15  Q.  Have you been retained by an attorney or

16  attorneys in the office of the corporation counsel for any

17  other cases?

18  A.  **Yes.**

19  Q.  How many times?

20  A.  **I would estimate about five or six times over the**

21  **years.**

22  Q.  Have you been retained by any attorneys with

23  regards to cases against the city?

24  A.  **Yes.**

25  Q.  How many times?

---

1  A.  **I would estimate about two or three times.**

2  **MS. KAWAI: At this time I would turn it over to**

3  Mr. Schweigert if he has any voir dire.

4  MR. SCHWEIGERT: Thank you.

5  VOIR DIRE EXAMINATION.

6  BY MR. SCHWEIGERT:

7  Q.  Doctor, I represent Ms. Coloyan.

8  A.  **Yes.**

9  Q.  And I have just a few questions, if I can. I

10  notice that you say you do still treat patients. On

11  average how many patients are you treating?

12  A.  **I would say about a dozen.**

13  Q.  At the present time?

14  A.  **Yes.**

15  Q.  Is this down from what maybe was a workload ten

16  years ago?

17  A.  **It's down from a workload of about six years ago.**

18  Q.  Oh.

19  A.  **When I -- I started to retire when I was 65, and**

20  **decided that I was still enjoying practicing a great deal**

21  **and didn't want to quit entirely. So I cut down on my**

22  **practice. And I'm seeing fewer patients, and doing fewer**

23  **forensic evaluations. But there is a marked drop from**

24  **what it was say ten years ago.**

25  Q.  So at any given time you have maybe approximately

---

12

1  12 patients?

2  A.  **Yes.**

3  Q.  When you do consulting work, you have done IME's

4  before, I assume?

5  A.  **Yes.**

6  Q.  And in the area of doing IME's, the same

7  percentage, 80 percent have been IME's for the defense, 20

8  percent have been IME's for plaintiff?

9  A.  **Yes.**

10  Q.  Can you name some of the lawyers that you have

11  worked for in the plaintiff's work?

12  A.  **Mr. Turbin. It was an attorney who I worked with**

13  **and sued against the city and county a few years ago. I**

14  **can't remember his name.**

15  Q.  Okay. Would you be willing, Doctor, to make a

16  list as you get an opportunity of the doctors that you've

17  done as far as plaintiff's work --

18  A.  **Yes.**

19  Q.  -- and defense work for the last four years?

20  A.  **Okay.**

21  Q.  And aside from -- I'll let you get that.

22  A.  **Okay.**

23  Q.  Aside from the 12 patients that you treat on

24  average now per year, would you consider yourself to be

25  retired with that kind of a base?

13

1  A.      Semi-retired.

2  Q.      Of those IME's that you do, how many IME's would

3  you do a year?

4  A.      I have 12 patients in my caseload at any given

5  time like on a weekly basis or every other week basis.

6  IME's, I do about two a month.

7  Q.      And when you do the IME's is it still the 20/80

8  percent basis?

9  A.      Yes.

10 Q.      And I noticed, Doctor, I have to ask these

11 questions about rates and things like that because money

12 can sometimes influence, I noticed you charge 675 per

13 hour?

14 A.      For depositions and testimony in court, that's

15 correct.

16 Q.      When you do IME's is that also 675 an hour?

17 A.      Well, the time spent for interviewing the

18 patient, reviewing records, preparing the report,

19 conferences, other kinds of out of court time is $450 an

20 hour.

21 Q.      When you treat patients you're not talking that

22 kind of money, or are you talking about that kind of

23 money?

24 A.      No.  When I treat patients the fee is less.

25 Q.      Now, you're currently board certified in

HONOLULU REPORTING SERVICES

14

1  psychiatry?

2  A.      Yes.

3  Q.      And is there a sub-specialty of that you have

4  been board certified in, or just the term psychiatry

5  covers it?

6  A.      Well, there is a general board in psychiatry

7  where I'm certified.  And then there are various

8  subspecialties, like addiction psychiatry, child

9  psychiatry, forensic psychiatry.  I'm not board certified

10 in any of those subclinical fields.

11 Q.      So it would be just the general term of

12 psychiatry then?

13 A.      Yes.

14 Q.      How long have you been board certified?

15 A.      Since about 1967.

16 Q.      Now, in this case how were you contacted to be

17 someone to do an IME?

18 A.      I was contacted by telephone.  And I don't

19 remember exactly who called me.  It was someone from Ms.

20 Kawai's office.

21 Q.      Was there a letter that went out first or was it

22 just a phone call?

23 A.      To the best of my recollection there was first a

24 telephone call and then it was followed up by a letter.

25 Q.      And do you have that letter with you?

HONOLULU REPORTING SERVICES

15

1  A.      I don't know.

2  Q.      Okay.

3  A.      I'll look.

4  Q.      Thank you.

5          I notice you are looking at a file.  Would this

6  be your entire file?

7  A.      Yes.

8  Q.      Would you mind at the completion of the depo,

9  maybe I should take a look at it now because I have not

10 seen it, make a copy of this record and file for the

11 deposition?

12          MS. KAWAI:  At this time is this still continued

13 within the voir dire?  Because we haven't even begun the

14 direct examination.

15          MR. SCHWEIGERT:  Right.

16          THE WITNESS:  Do you want to see the entire file

17 or the letter that came confirming --

18          MR. SCHWEIGERT:  Engagement letter.

19          MS. KAWAI:  This is trial testimony though, isn't

20 it?

21          MR. SCHWEIGERT:  What's the purpose?

22          MS. KAWAI:  This is not a discovery deposition.

23 Can we go off the record real quick.

24          THE VIDEOGRAPHER:  We're off the record at 2:53.

25          (Discussion held off the record.)

HONOLULU REPORTING SERVICES

16

1          THE VIDEOGRAPHER:  On the record at 2:57.

2          MR. SCHWEIGERT:  Based on the agreement of the

3  parties I'm going to stop my further voir dire at this

4  time.  And I'll bring it up, Doctor, when I have an

5  opportunity to cross-examine you --

6          THE WITNESS:  Okay.

7          MR. SCHWEIGERT:  -- so we can make it more

8  expeditious.

9          MS. GAVIGAN:  Thank you.

10         MS. KAWAI:  Thank you.

11 Q.      Doctor, Mr. Schweigert just began to ask you

12 basic questions about who retained you for this case.

13 A.      Yes.

14 Q.      How long did the examination of plaintiff

15 actually last?

16 A.      It was about two and a half hours.

17 Q.      And what was your assignment?

18 A.      My assignment, as I understood it, was to

19 determine whether Ms. Coloyan had a psychiatric illness or

20 disorder, what the nature of it was, its duration, and its

21 cause, and whether she required any additional treatment.

22 Q.      Mr. Schweigert just briefly went over your rates

23 that you charge.  Are the rates that you just mentioned

24 what you charge to any party that wishes to retain you for

25 your services?

HONOLULU REPORTING SERVICES

17

1  A.        Yes, they're the same.

2  Q.        And did you write a report about your assessment

3  of plaintiff?

4  A.        Yes, I did.

5  Q.        I'm going to be handing you what will be marked

6  as Exhibit No. 1.

7           MR. SCHWEIGERT: Thank you.

8           THE WITNESS: Yes, that's my report dated July

9  12th, 2005.

10 BY MS. KAWAI:

11 Q.        And you recognize that document, correct?

12 A.        Yes.

13 Q.        And when did you write your report?

14 A.        I wrote it between the time that I examined

15 Ms. Coloyan and the time that it was sent on July 12th.

16 Q.        And when did you -- What date did you examine

17 Ms. Coloyan?

18 A.        I made a mistake. I examined her on July 12th.

19 The report was sent August 10th, 2005.

20 Q.        Was your report based on your examination of

21 plaintiff and review of records?

22 A.        It was based on my examination, which included a

23 history, an assessment of her mental status, an

24 examination of her and her demeanor as she presented

25 information to me, psychological testing, and a variety of

18

1  records which were provided to me.

2  Q.        And you mentioned you reviewed records to

3  familiarize yourself with plaintiff's medical history,

4  correct?

5  A.        That's correct.

6  Q.        What medical records did you review?

7  A.        The medical records included the personnel

8  records from the Castle Medical Center, records from the

9  Liberty Mutual Group, Ken Davenport, M.D., Steven M.C.

10 Lum, M.D., the complaint, and the various amended

11 complaints that were filed.

12           MR. SCHWEIGERT: I'm going to object to that

13 answer as not being responsive to the question, Doctor. I

14 believe the question was medical records that you looked

15 at. You appear to be going beyond that.

16           THE WITNESS: Okay.

17 BY MS. KAWAI:

18 Q.        Doctor, I was going to actually split it up in

19 two questions. In terms of medical records is there

20 anything else, I guess, with regards to the records you

21 reviewed except for the Liberty Mutual, Dr. Davenport and

22 Dr. Lum's records?

23 A.        The additional records that I reviewed were the

24 first amended complaint, the second -- The complaint, the

25 first amended complaint, the second amended complaint, the

19

1  third amended complaint, and the fourth amended complaint,

2  the plaintiff's response to defendant William Badua's

3  first request for answers to interrogatories, the

4  plaintiff's response to defendant William Badua's first

5  request for production of documents and things to

6  plaintiff, and the depositions of William Badua, Ofelia

7  Coloyan, Spencer Anderson, Darren Nihei, Donald Stafford,

8  Neil Pang, and Detrich Kamakani.

9  Q.        What was significant in the records that you

10 reviewed?

11           MR. SCHWEIGERT: I'm going to object. The

12 question is vague, general, calls for a narrative.

13 BY MS. KAWAI:

14 Q.        Let's split this up into two questions. What was

15 significant about the medical records that you reviewed,

16 if any?

17           MR. SCHWEIGERT: Same objection. The question is

18 vague, ambiguous, general, calls for a narrative.

19 BY MS. KAWAI:

20 Q.        You can answer the question.

21 A.        The relevance of Dr. Davenport's records was that

22 it described two injuries from auto accidents that

23 Ms. Coloyan had. There was minor injury and she

24 recovered. There did not seem to be any prolonged illness

25 or magnification of symptomatology, or prolongation of

20

1  disability. She seemed to heal and return to her

2  functions in a way that one might expect given the nature

3  of the injury.

4           And I felt this was important particularly in

5  conjunction with the personnel reports that I reviewed

6  from Castle which described her as a hard working,

7  conscientious, loyal employee who went over and above what

8  was called of her or asked of her, was helpful

9  spontaneously to other workers and staff. And so it was

10 all consistent with an individual who has integrity and

11 has a high system of values and ideals for herself.

12 Q.        With regards to the non-medical records, what

13 significant --

14 A.        Let me go on. The records of Dr. Lum were

15 important because they indicated that Ms. Coloyan had had

16 difficulties with sleep both before and after. This

17 wasn't the first time. So she seems to be an individual

18 who, when she's troubled by whatever might be going on in

19 her life, it affects her sleep.

20           More specifically, with respect to this incident

21 about which she's complaining, his description of her

22 statements was consistent with what she told me. He

23 viewed her as being sufficiently emotionally distressed,

24 so that he advised her to stay off work for three weeks.

25 And by the end of that she had recovered. There were no

21

1  further entries in his file relating to that incident.
2  **And he concurred with her desire to return to work.**
3  Q.        And with regards -- Are you finished in terms of
4  the medical records that you reviewed?
5  A.        **Yes, yes.**
6  Q.        With regards to the other non-medical records,
7  which appears to be the pleadings and depositions taken in
8  this lawsuit, did you find any significance from reviewing
9  those documents?
10        MR. SCHWEIGERT: I'll note an objection to that
11  question. Your dealing with non-medical records is a lack
12  of foundation and competence to talk about, and also
13  they're hearsay.
14  BY MS. KAWAI:
15  Q.        You can answer.
16  A.        **In reviewing some of the other documents of the**
17  **date of when this incident occurred changed several times.**
18        MR. SCHWEIGERT: Let me add an additional
19  objection as to lack of foundation. Competence to talk
20  about what any mistake, a date or whatever, could have
21  been caused by. In other words, don't forget the guy that
22  wrote it, me.
23        THE WITNESS: Well, somewhere there were a number
24  of mistakes, either from the information that was provided
25  or in the way it was presented. And I was struck by that.

HONOLULU REPORTING SERVICES

22

1  BY MS. KAWAI:
2  Q.        And in terms of the other documents that you
3  reviewed --
4  A.        **I want to add at this juncture that I might not**
5  **have been as struck by that were it not for the fact that**
6  **there were a variety of other inconsistencies that I**
7  **encountered in the course of reviewing all the data that**
8  **was available. And that was one more part of it without**
9  **being certain whether the source was Mr. Schweigert or**
10  **Ms. Coloyan.**
11        MR. SCHWEIGERT: Adding an additional objection
12  of speculation for the doctor.
13        THE WITNESS: The deposition of the police
14  officers who were concerned was significant. They were
15  all consistent and in agreement --
16        Very melodious, Counsel.
17        MR. SCHWEIGERT: Thank you. I try to keep it
18  light, Doc.
19        THE WITNESS: -- were in agreement in stating
20  that they had gone to the house of Ms. Coloyan to serve an
21  arrest warrant for her son Allan. They specified that
22  they did not have a search warrant and would not enter
23  without a search warrant unless they had the backup SWAT
24  team, with the inherent danger of going into someone's
25  residence without proper backup.

HONOLULU REPORTING SERVICES

23

1        And, as I said, some of them, what was said, some
2  of them didn't, but all of them were in agreement in terms
3  of if they heard what was said they agreed on that, and
4  that Ms. Coloyan invited them in. That they didn't go in
5  uninvited.
6        The deposition of Ms. Coloyan was important
7  because in it she provided a description of what occurred.
8  She described her reaction along with that of her husband
9  to what occurred. And once again I noted significant
10  information as to what was actually the most distressing
11  aspect of this whole incident. And again noted
12  inconsistencies.
13  BY MS. KAWAI:
14  Q.        Did you make any diagnosis after conducting your
15  examination of plaintiff?
16  A.        **The diagnosis was that she had an adjustment**
17  **disorder with mixed anxiety and depressed mood.**
18  Q.        And did you make any other diagnosis in this
19  case?
20  A.        **On Axis II, which is the diagnosis of lifelong**
21  **disorders, such as a personality disorder or mental**
22  **retardation, there was no diagnosis. There was no**
23  **indication of retardation. There were no indications she**
24  **had a personality disorder.**
25        **On Axis III, which is the division of the**

HONOLULU REPORTING SERVICES

24

1  diagnostic section that deals with medical problems, there
2  were no significant relevant medical issues.
3        **On Axis IV, which deals with psychosocial and**
4  **environmental problems or stresses, there was a**
5  **significant problem, and that was her concerns that her**
6  **son might be arrested on, possibly on drug related**
7  **charges.**
8        **And on Axis V, which is the section that deals**
9  **with the general assessment of functioning, I placed her**
10  **at 75, which is fairly high. It indicates that someone is**
11  **symptom free unless they encounter stresses which causes**
12  **them to have symptoms.**
13  Q.        In terms of Axis I, what is an adjustment
14  disorder with mixed anxiety and depressed mood?
15  A.        **An adjustment disorder is an illness that comes**
16  **about in response to some external event in a person's**
17  **life. It might be a divorce. It might be losing a job.**
18  **It might be, as in this case, being told that, Ms. Coloyan**
19  **being told that her son was wanted for arrest on drug**
20  **charges.**
21        **And so it's a reaction to something that's**
22  **external and stressful. If it consists of depressive**
23  **symptoms, there might be sleeplessness, depressed mood,**
24  **loss of appetite, loss of energy, which she reported.**
25        **The dimension of anxiety is manifest by**

HONOLULU REPORTING SERVICES

25

1  difficulty organizing her thoughts, feeling tense, shaky,

2  being shaky or feeling shaky.

3          She also reported that -- I think those are most

4  of the -- Excessive worry about her son was a prominent

5  symptom that was present from the time that the police

6  came to her house to serve the warrant until sometime

7  after this event.

8  Q.      Is the term adjustment disorder with mixed

9  anxiety and depressed mood, is that the same terminology

10  that you would connect with emotional distress?

11  A.      Emotional distress is a common lay term.  It

12  doesn't necessarily imply that the distress has been

13  significant enough to reach the level of a psychiatric

14  disorder.  So someone might be emotionally distressed in

15  hearing that a child was severely ill, but that wouldn't

16  necessarily mean that it would rise to the level of a

17  psychiatric disorder.

18          Because in order to be an adjustment disorder

19  there has to be an impairment either in one's ability to

20  work, in one's ability to conduct their relationships, or

21  their ability to kind of function internally, such as

22  think clearly, have good judgment.  If these are

23  interfered then we say the person has an adjustment

24  disorder.

25  Q.      And could you briefly describe in terms of

HONOLULU REPORTING SERVICES

26

1  diagnoses what the various axes are for like I, II, III,

2  IV and V?

3  A.      Axis I pertains to a psychiatric illness or

4  disorder.  An example would be a major depressive disorder

5  or schizophrenia, or in this case an adjustment disorder,

6  which is in the normal course of things circumscribed and

7  short-lived.

8          Axis II, which deals with personality disorders

9  or retardation, it refers to a lifelong kind of problem.

10  So if someone, for instance, has a passive aggressive

11  personality disorder all their life, they tend to

12  procrastinate, express resentment by forgetting things,

13  doing things improperly, being chronically dissatisfied,

14  and feeling that they're not adequately acknowledged.  And

15  that's a long, long pattern of the way they view things

16  and the way they behave.  That would be an example of

17  personality disorder.

18          By Axis III, as I said, could be a medical

19  illness such as heart disease or diabetes.

20          Axis IV relates to various areas of problems.  It

21  can be in the area of primary relationships, such as

22  marital relationship, or dissatisfaction with work.

23          And Axis V has to do with their general level of

24  functioning.

25  Q.      What is your opinion as to the primary cause of

HONOLULU REPORTING SERVICES

27

1  plaintiff's adjustment disorder?

2  A.      The primary cause was her learning that her son

3  was -- that there was a warrant for her son's arrest on

4  drug charges.

5  Q.      And what was the basis for concluding that the

6  primary cause of plaintiff's adjustment disorder was due

7  to her concern for her son?

8  A.      It was based on the manner in which she related

9  it.  She was quite emotional when she talked about it.

10  You know, it was her facial expression, her body language,

11  her tone of voices, the number of times that she referred

12  back to it without my asking her, the way in which it

13  affected some of her relations with her family and

14  neighbors.

15          To be more specific, early in my report, on page

16  2, she made the statement that she knew she had done

17  nothing wrong, although she was extremely frightened.  She

18  said she was worried for her son because the officer told

19  her that he was involved with drugs.

20          And at another point, on page 4, she described

21  having sleepless nights worrying about her son, and to the

22  point where she called Dr. Lum for medications.  Just

23  above that, she was afraid that someone might be watching

24  her house to see if her son had returned.

25          At another point she said that when she discussed

HONOLULU REPORTING SERVICES

28

1  it with her children, the family was more -- she was

2  talking about her decision to file a lawsuit.  And said it

3  was her own idea.  And when she talked about it with her

4  children, they and she were really more concerned about

5  what was going on with her son.  And she said that even

6  that, she hadn't even told her brothers and sisters that a

7  warrant was issued for his arrest.  She gets together with

8  them about every other week to spend time.  Described a

9  close relationship with them.

10          In addition to that, she said at another point in

11  the interview, well, this was in her deposition, she said

12  that she was worried about him, and that her husband was

13  worried about him as well.  She said that she was

14  preoccupied primarily with her son and the fact that he

15  might be arrested in Alaska.  And this was really the

16  issue that she gave, to which she gave a great deal of

17  emphasis during the interview because not only her anxiety

18  and concern for him and that he might be arrested, but

19  also how it would reflect on the family.

20  Q.      Did you form any other opinions as to any other

21  cause of her adjustment disorder?

22  A.      She said that she was deeply embarrassed by the

23  neighbors being told that her son was wanted for arrest on

24  drug charges.

25  Q.      In terms of the embarrassment, what was -- what

HONOLULU REPORTING SERVICES

29

1  is the basis on which you offer that opinion?

2  A.      She said on page 3, I have reference to her

3  adding that before the policemen left, according to her,

4  they said that they had talked to her neighbors about

5  Allan.  And she said that she was extremely ashamed by

6  this.  On page 4 I refer to her having said that she

7  hadn't had any conversations with the neighbors about this

8  incident, and again repeated she was very embarrassed by

9  it.

10 Q.      Doctor, in addition to, I guess, the

11 embarrassment with her neighbors, was she embarrassed to

12 relate the incident to anyone else?

13 A.      Her brothers and sisters.  She did discuss it

14 with her husband that night when he came home and she did

15 discuss it with her children.  She did not discuss it with

16 her neighbors.

17 Q.      Is it your opinion that she was embarrassed in

18 general about what other people might think of her if they

19 learned about the arrest warrant for her son?

20        MR. SCHWEIGERT:  Objection.  The question is

21 leading, compound.

22        THE WITNESS:  Would you repeat the question?

23 BY MS. KAWAI:

24 Q.      Is it your opinion that plaintiff was embarrassed

25 in general about what people thought about her or how they

HONOLULU REPORTING SERVICES

30

1  saw her?

2  A.      Her temperament is that she's the kind of

3  individual who in general is concerned about what other

4  people think of her.  It's reflected in her behavior.

5  It's reflected on the psychological testing, where there

6  were a number of statements indicating this.  And it's

7  reflected in her statements that she was highly

8  embarrassed that people would have even seen police at her

9  house, much less know that her son was wanted to be

10 arrested on drug charges.  And not even telling her own

11 brothers and sisters about it.

12 Q.      Is there any other opinions that you formed as a

13 cause of plaintiff's adjustment disorder?

14 A.      Yes.  She was distressed by having the police

15 there.

16 Q.      And what was the basis on which you offer that

17 opinion?

18 A.      She referred at one point, I've forgotten her

19 exact words, but something to the, they were all over the

20 place, referring to the fact that they had searched her

21 house.  And she felt embarrassed by this.  She made one or

22 two other statements to the effect she was embarrassed by

23 having police come to her house.  So that I felt that that

24 was, in my opinion that was an additional source of stress

25 for her.

HONOLULU REPORTING SERVICES

31

1  Q.      Why is it that you labeled this cause of her

2  adjustment disorder as of less importance than the other

3  two opinions that you listed?

4  A.      It was because of the manner and the intensity

5  that she had in her demeanor when she was describing her

6  worry about her son and staying up at night worrying about

7  him.  Talking about it with her husband.  The fact that

8  she made a point of avoiding or mentioning it to her

9  brothers and sisters, with whom she's quite close.  Her

10 statement that she felt uncomfortable with the neighbors

11 because of her son.

12        And, as I've already said, according to her this

13 was on her mind a great deal of the time afterward.  And

14 from the manner that she presented it, that this was

15 first and foremost disturbing issue for her.

16 Q.      Did plaintiff tell you that she became

17 increasingly angry after the incident when she thought

18 about what had happened?

19        MR. SCHWEIGERT:  Objection.  Leading.

20        MS. KAWAI:  Let me rephrase.

21 Q.      Did plaintiff at any time during your interview

22 tell you she became angry after the incident?

23        MR. SCHWEIGERT:  Same objection.  That's the same

24 question.  You didn't even change your question.

25        MS. KAWAI:  I did.  I did rephrase it a little

HONOLULU REPORTING SERVICES

32

1  bit.

2        MR. SCHWEIGERT:  Same objection.  Leading

3  question.  I'm sorry.

4        THE WITNESS:  Shall I answer it or wait for you

5  to rephrase it?

6        MS. KAWAI:  I'm going to rephrase.

7  Q.      Doctor, what, if anything, did plaintiff tell you

8  about how she felt after the incident on June 3rd, 2003?

9  A.      She said she was, in addition to feeling

10 frightened and worried for her son, she was angry because

11 the police asked the same questions more than once,

12 several times in terms of inquiring about where her son

13 was.  And she felt they didn't believe her, otherwise they

14 wouldn't have asked her more than once.  She said that

15 made her angry.

16        She said that after they left and she thought

17 about what had happened, that her house had been entered

18 without a warrant, she became angry at that.  And

19 according to her, Officer Badua, when she questioned his

20 coming into the house, according to her he said this badge

21 is enough.  And she felt that this was high handed.  And

22 this also angered her.  And she said as time went on she

23 thought about this some more and became increasingly

24 angry.

25 Q.      Did you form any opinion as to why she became

HONOLULU REPORTING SERVICES

33

1  angry?

2  A.    She --

3      MR. SCHWEIGERT: I'll note an objection. The

4  question goes beyond the scope of the report, therefore,

5  it's an improper area.

6      MS. KAWAI: Actually on page 35 of his report he

7  actually refers to various issues of why she was angry.

8      MR. SCHWEIGERT: It talks about why she was

9  angry? It goes into the cause of her anger? I don't

10  recall that, Counsel. Which page?

11      MS. KAWAI: Page 35.

12      MR. SCHWEIGERT: And your point is? I'm not

13  discounting the word that she felt angry in the report.

14  I'm not questioning that. You are asking him what is the

15  source of the anger. And that goes beyond the scope.

16      THE WITNESS: I've referred to that on page 35 at

17  the top.

18  BY MS. KAWAI:

19  Q.    You can just answer. Go ahead.

20  A.    She said that the more she thought about the

21  incident, she believed that her rights had been violated.

22  And she was angry about that.

23      And later on, or at some point in the interview

24  when I asked her what she hoped to accomplish with this

25  legal action, she said that she hoped that she would be

34

1  compensated for the suffering she had experienced, and

2  that, she put it, she wants her rights to be acknowledged.

3  By that I took her to mean that she wants there to be an

4  acknowledgment that her civil rights had been violated.

5  Q.    Doctor, how long did plaintiff suffer from this

6  adjustment disorder?

7  A.    About three weeks.

8  Q.    And once the three weeks had past did she have

9  any remaining problems?

10  A.    They were minimal. She continued to work. She

11  said she got along satisfactory with her husband. So it

12  didn't interfere with her functioning. She continued to,

13  however, worry about her husband. But she was no longer

14  unable to work. As I said, her appetite returned. She

15  was able to think clearly. She was no longer shaking.

16  She was no longer suffering from lack of energy. The

17  various symptoms that I described she had during the early

18  part when she was at the height of her emotional distress.

19  Q.    Based on what you had just mentioned, is that how

20  you came to the conclusion that her emotional distress

21  only lasted three weeks?

22  A.    It's a combination of what she told me and also

23  looking at the records of Dr. Lum, which confirmed this or

24  were in agreement with it. He described a period of three

25  weeks that based on what she told him and the way she

35

1  appeared to him being off work and then said that and then

2  released her to return to work.

3      In addition to that, she told me she became

4  anxious to go back to work because she felt bored staying

5  at home. So this is certainly not someone going back to

6  work even though they're suffering and having difficulty

7  functioning. She said she was bored.

8  Q.    And did plaintiff ever mention to you or --

9  Strike that.

10      Is it fair to say that plaintiff overcame her

11  adjustment disorder without any psychiatric or

12  psychological treatment?

13  A.    She did not have any specific psychiatric or

14  psychological treatment. She had some support from Dr.

15  Lum. And she had some medication to help her sleep. But

16  in a strict sense she didn't -- the illness did not rise

17  to such severity and wasn't so prolonged that she needed

18  to see a mental health professional.

19  Q.    In your interview with plaintiff did you talk

20  with her about what happened when the police came to her

21  home?

22  A.    Yes.

23  Q.    And what did she tell you?

24  A.    She said that she was at home alone. Her husband

25  having gone out for dinner with her son. And that she was

36

1  watching a television, her favorite television program,

2  American Idol. And she was in the darkened room when she

3  heard a loud banging on the door. As she put it, it was

4  so loud you could hear it half a mile away. And she was

5  startled by this.

6      She said she went to the door and opened it, and

7  said that there were police there and that she asked them

8  what was wrong. She said, according to her, two of the

9  officers entered her home passing by either side of her.

10  And she said there were two other police behind them who

11  didn't enter. This is the first account that she gave to

12  me of what had happened. She added a third policeman came

13  to her house later on. She was aware of some others being

14  present outside. And didn't know how many.

15      According to her, one of the officers, Officer

16  Badua, said that he was looking for her son. And she said

17  that she asked him if he had a paper, by which I assume

18  she meant a warrant, to come into her home. And her

19  statement is that he said my badge is enough.

20      When I asked her about this she said she had been

21  a security employee for Wackenhut Security and she knew

22  police needed to have a search warrant to enter your home.

23  Then she went on to describe them asking her about where

24  her son was. And telling her that he was -- They had a

25  warrant for his arrest because of his involvement with

37

1  drugs.

2        MR. SCHWEIGERT:  I think we need to take a break

3  for a minute, Doctor.

4        THE VIDEOGRAPHER:  We're off the record at 3:38.

5        (Recess taken.)

6        THE VIDEOGRAPHER:  On the record at 3:46.

7        THE WITNESS:  Ms. Coloyan said that the officer

8  asked her repeatedly where her son Allan was.  And then

9  she became angered by this because she thought he didn't

10  believe her.  She told him he was fishing with her

11  son-in-law in Alaska where he was then.  Spends time in

12  Hawaii and then goes on to the Philippines.

13        She said the police then proceeded to search her

14  home without asking her permission.  She said that

15  according to Officer Badua, she should contact him if her

16  son should come home.  And if she didn't, she would be, as

17  she put it, in big trouble.

18        And she added also that before the policemen left

19  her home they said they had talked to her neighbors about

20  Allan.  She said she was extremely ashamed by this.  And

21  she was also incensed that they would have talked to her

22  neighbors about this situation even before they came to

23  her.

24        She said that after they left she got a glass of

25  water.  And after they left she began to shake.  She had

38

1  given the police her daughter-in-law's cell phone number

2  in Alaska, and because she wanted to be cooperative and

3  facilitate their being able to contact her son in Alaska,

4  if that's what they wanted to do, by contacting him

5  through her daughter-in-law.  And she said that she was at

6  the same time very frightened that they would send police

7  to arrest her son in Alaska.

8        Later her husband came home.  And she was very

9  upset, crying, shaking.  She said that her husband wanted

10  to take her to the hospital, but she felt she didn't need

11  to.  Besides, she wanted to go to work the next day.

12        She did go to work, but she wasn't able to finish

13  the day because she was light-headed.  She was having

14  trouble concentrating.  She was feeling down.  She was

15  anxious.  And her mind, as she put it, was all over the

16  place.  And was having trouble eating.

17        She also said that she got to thinking about what

18  had occurred and became angry because of her house being

19  entered without a warrant and the statement that,

20  according to her, had been made by Officer Badua, that my

21  badge is enough, referring to his coming into her house.

22  She consulted with Dr. Lum, her family physician.

23        MR. SCHWEIGERT:  I'm sorry.  I'm starting to lose

24  where -- You're giving a narrative right here, Doctor.

25  What is the purpose of the narrative?

39

1        MS. KAWAI:  Actually I was just asking a

2  narrative.

3  Q.        Let's stop you right there.  I was just looking

4  for a narrative as to what happened at home.  Let me stop

5  you right there.

6        In addition to what she told you in your

7  interview of her what happened at her house, did you

8  review any records of plaintiff's account of what had

9  happened?

10  A.        Yes.

11  Q.        Did you find any inconsistencies in plaintiff's

12  account of what had happened?

13  A.        Yes.

14  Q.        And what were those inconsistencies?

15  A.        She -- Well, the first possible inconsistencies

16  were on the date this happened that was registered on the

17  complaint, the year and the month changing.

18        Another inconsistency was that in her deposition

19  she initially said that she wasn't worried at all or

20  concerned when you asked her about that, about her son

21  having committed a crime.  But she had told me that while

22  the police were still there she was very worried about her

23  son, was worried he might be arrested in Alaska.  So there

24  was an inconsistency in that area.

25        One point she said that she was nervous and shaky

40

1  when the police were there.  Another point she said it was

2  after they left that it hit her and she really began

3  shaking.

4        She at one point said that there were three

5  policemen in the room, in the home.  At another point she

6  said there were four.

7        She in her deposition a couple of times said she

8  invited themselves in, which would be different than them

9  just entering without any kind of permission.  To me when

10  you invite yourself in you ask someone can I come into

11  my home.  And then if they say yes, you go in.  And if

12  they say no, you don't.  And she was unhappy that they had

13  invited themselves in.  She made no mention of that in the

14  interview with me.  This came up in her deposition.

15        She contradicted herself a couple of times in the

16  deposition in which she said she wasn't worried about her

17  son and whether or not he had committed a crime.  Whereas,

18  in the interview with me this was a major focus of her

19  concern and she was quite emotional about it.  By that I

20  mean the intensity with which she described that.

21  Q.        Doctor, what is the significance to you of these

22  inconsistencies?

23  A.        Well, I think she was emotionally distressed at

24  being informed that her son was, there was a warrant for

25  her son's arrest.  She was upset by hearing that her

41

1  neighbors were told about this. She was upset by having
2  the police there at all.
3  And I think that with these inconsistencies I
4  don't think she was trying to be misleading in any way. I
5  think it calls into question the accuracy of her memory
6  for other things that happened when the police came.
7  Q.    Is it important for a psychiatrist to perform an
8  examination such as you did when assessing that person's
9  mental or emotional health?
10  A.    It's very important because there's so much
11  information that you get from a person's tone of voice,
12  their inflections, their facial expression, their body
13  language, and a whole great number of cues that you get
14  from people on an unconscious level that you can only have
15  access if you are with the person and examining them in
16  person.
17  It's true to such a degree that that is the
18  importance of actually being with someone and examining
19  them that the American Psychiatric Association has a
20  policy that we should not publically make a diagnosis
21  unless you've examined the person.
22  Q.    If a psychiatrist weren't able to perform an in-
23  person examination, what type of obstacles would that
24  psychiatrist be presented with in making an assessment?
25  A.    They would have to rely on other sources of

42

1  information. Possibly other medical records or reports.
2  But they would have to do without all this other
3  information of emotional tone, emotional emphasis, changes
4  in speech, body language, all that information that you
5  get when you're with someone that you don't get if you try
6  to do an examination or file a report without seeing the
7  person.
8  Q.    In this particular case what was the importance
9  for you in conducting this examination of plaintiff?
10  A.    Well, without actually talking to her and being
11  with her as she described how worried she was about her
12  son, and how humiliated she felt about the neighbors, I
13  think it would have been hard to tell the difference
14  between how much of an emotional upset she had as a result
15  of the warrant, having the police present, or having the
16  neighbors informed that the police were looking for her
17  son. It was with all this other information that it was
18  quite clear what was the most upsetting for her. And that
19  was, as I said before, her son being wanted for arrest,
20  and the neighbors knowing, and also the police being
21  there.
22  Q.    Did the emotion that plaintiff showed in your
23  interview with her confirm her concern for her son being
24  wanted by the police?
25  A.    I'm not sure if I understand you.

43

1  Q.    So in terms of the interview you had with
2  plaintiff, based on your assessment of your in-person
3  interview with plaintiff, did that confirm -- did that
4  confirm that her concern was, on that day was for her son
5  being wanted by the police?
6  A.    That was the basis for forming that opinion.
7  Q.    Are all the opinions that you give, that you have
8  given here today made to a reasonable degree of medical
9  probability?
10  A.    Yes.
11  MS. KAWAI: Thank you, your Honor. I mean, thank
12  you, Doctor.
13  EXAMINATION
14  BY MR. SCHWEIGERT:
15  Q.    Thank you, Doctor. If I can. I noticed, Doctor,
16  when you go through your report and write your report you
17  actually start off in the first paragraph talking about
18  the illegal search of my client's home without her consent
19  by four police. Do you see that on the first page of your
20  report of August 10, 2005? I'm on the first page, first
21  paragraph.
22  A.    Yes.
23  Q.    Now, in fact, does she tell you that there were
24  two policemen that immediately come into her house and two
25  policemen at the door, and then those two policemen that

44

1  were at the door, they themselves also do the search? Did
2  you hear that at all during her interview?
3  A.    Yes.
4  Q.    By her testimony?
5  A.    Yes.
6  Q.    But then you're saying somehow it would change to
7  three officers being in the house?
8  A.    Yes.
9  Q.    Did you comment to her about that inconsistency
10  as you saw it to be, where at one time she's talking in
11  terms of three and another time she's talking in terms of
12  four?
13  A.    No.
14  Q.    And why would that be?
15  A.    There was no reason to.
16  Q.    Did you notice that as a conflict in her
17  testimony?
18  A.    I noticed it -- I don't remember if I noticed it
19  at the time or afterwards I was reviewing my notes.
20  Q.    Well, how do you do this? When you do this
21  report, I assume you are not writing this report as Ms.
22  Coloyan is sitting there in front of you. That you are
23  doing this report from notes or perhaps journal entries or
24  something at a later time after you've interviewed Ms.
25  Coloyan?

45

1   A.        No.  I take voluminous notes as we're talking.
2   And then I -- My practice is to dictate it and have it
3   transcribed.  And usually the first draft is disorganized.
4   And so it goes to another draft when I put it in order.
5   And sometimes it's at that point that I may notice
6   inconsistencies that I didn't pick up on at the time that
7   the person saying gave me an inconsistent response.
8   Q.        So how many drafts did you do, Doctor, on this
9   August 10th, 2005 report?
10  A.        This probably was the third draft.
11  Q.        And do you have the other drafts with you?
12  A.        No.  My practice is to discard them.  They're
13  just working copies that I don't keep.
14  Q.        And are these -- I mean, this is an independent
15  medical examination you're doing of Ms. Coloyan?
16  A.        Yes.
17  Q.        But independent is kind of a misnomer.  You're
18  actually hired by the defense to do this examination,
19  correct?  It's not like she's your patient?
20  A.        No.
21  Q.        She's sent to you by a request by the defense to
22  have her examined by you.  Is that what you understand the
23  process to be?
24  A.        Yes.
25  Q.        And all of the monies that are paid for this

46

1   examination and the writing of the reports and appearing
2   even today in this deposition are paid for by the defense?
3   A.        Yes.  Are you implying that when I -- my report
4   is therefore dictated by the fact that they're hiring me?
5   Q.        Well, you are welcome to answer that, Doctor.
6   A.        Well, I'm asking you.
7   Q.        I just want to put the fact on the record as we
8   go through -- The jury in the end has to make a decision
9   which doctor to believe or which witness to believe.  And
10  factors like financial payment can come into a juror's
11  mind as something that might temper someone's testimony.
12  It doesn't have to.  But it's my duty as I go through your
13  deposition to try to establish all the factors so as to
14  give the jury the whole picture so they can make an honest
15  and complete evaluation.  And that's all I'm trying to do
16  today.
17  A.        Fine.
18  Q.        So I notice though that there was disparity of
19  four versus three.  And my question was whether you
20  pointed that out.  And your response, it might have been
21  actually something you picked up in later edits of the
22  report?
23  A.        Yes.
24  Q.        I also noticed, Doctor, that when you write in
25  this report you actually sometimes darken words, or is it

47

1   just my copy?  Like an example would be on page 11 where
2   you're going over Dr. Lum's medical notes.  Now, Dr. Lum
3   is who to Ms. Coloyan?
4   A.        Her primary care physician.
5   Q.        He is basically who?  He's the guy that she would
6   go to for almost all of her medical treatment?
7   A.        Yes.
8   Q.        And so it would be logical if she's having a
9   problem to go to Dr. Lum if she's having some kind of
10  anxiety as a result of this case?
11  A.        Yes.
12  Q.        And you see by the notes that she does go to Dr.
13  Lum apparently the very next day after this incident?
14  A.        Yes.
15  Q.        Now, I noticed that there's certain times in your
16  writing here on Dr. Lum's note that you make it darker.
17  Was that your intent?
18  A.        Yes.
19  Q.        So that if there's emphasis it's something that
20  you are drawing attention to, not something that Dr. Lum
21  has written in the format that he has written?
22  A.        That's correct.
23  Q.        Now, as to what Dr. Lum did, I notice that in the
24  end of your report you indicate that he was ready to send
25  her back to work after two weeks.  Do you see that?

48

1   That's on page 34, Doctor.  You actually indicated his
2   records indicate that she returned to work after two
3   weeks.  And that's the second paragraph, at the end of
4   that second paragraph on page 34.
5   A.        On page 34, which paragraph are you pointing?
6   Q.        Yes, Doctor.  I'm looking at the end of the
7   second paragraph where you start off, it's in parentheses,
8   Dr. Lum's records indicate she returned to work after two
9   weeks.
10  A.        Yes.
11  Q.        Now, did you talk to Dr. Lum at all for purposes
12  of doing this IME?
13  A.        No, I did not.
14  Q.        Is it fair to say that the only thing you did for
15  this IME would be to examine the patient, Ms. Coloyan, and
16  look at the documents that are indicated in your report
17  that you were given to look at?
18  A.        Well, I wouldn't say it was the only thing as
19  though that was -- Kind of seems to diminish the amount of
20  work that went into this.  There were a lot of documents
21  that I reviewed, including his, the various statements by
22  the other police officers involved, her own personnel and
23  medical records.  So I kind of take issue with your
24  diminishing the amount of research that went into
25  preparing my opinions.

49

1  Q.    I'm sorry if that's what I said.  I thought I
2  said the only thing that you did.  I did not mean to
3  diminish your opinions.
4        You looked -- You examined Ms. Coloyan, and you
5  looked at documents that were given to you to look at for
6  purposes of doing your opinion?
7  A.    Yes, that's correct.
8  Q.    And the documents that you looked at are those
9  documents identified on page 10?
10 A.    Yes.
11 Q.    I noticed included in the list of documents were
12 a series of legal pleadings, like the complaints?
13 A.    Yes.
14 Q.    And actually the depositions of the police
15 officers?
16 A.    Yes.
17 Q.    Now, do you have any idea what the purpose of
18 giving you depositions of police officers would be for
19 purposes of you doing a medical examination of this case?
20 A.    Well, the accuracy of Ms. Coloyan's account as to
21 what actually occurred to upset her is an important issue
22 here.
23 Q.    Are you looking at the police officers'
24 accounting as a truthful accounting?
25 A.    I'm looking for consistency and how they match up

50

1  with her account.
2  Q.    So did you draw some significance that they're at
3  odds with her account?
4  A.    I drew some significance from the fact, more
5  significance from the fact that they were consistent.  And
6  the fact that there was a remark that one of them made we
7  would have had a SWAT team if they were going to enter
8  without permission because of their safety as being
9  significant.  So I placed a fair amount of credence on
10 those reports based on that fact as well as the
11 consistency.
12 Q.    So you relied upon the police officers in part in
13 making your prognosis in this case?
14 A.    Not my prognosis.  I relied in part on the police
15 officers' account in terms of forming an opinion as to how
16 likely her accuracy would be about her description of what
17 occurred.
18 Q.    And based on that you formed an opinion from what
19 the police officers are saying in their depos as to that
20 accuracy?
21 A.    I think you're over-simplifying it.
22 Q.    Help me.
23 A.    There were a number of developments that went
24 into my forming an opinion about her accuracy or possible
25 inaccuracy I should say.  There were her own

51

1  inconsistencies.  And there was, on the other hand, in
2  addition to that, the consistency of the officers and the
3  statement that they would not risk putting themselves at
4  risk by entering without a SWAT team behind them.
5  Q.    I notice you went through every police officer
6  except Neil Pang.  Is there a reason you left Neil Pang
7  out?
8  A.    There was nothing in there that was relevant.
9  Q.    In Neil Pang?
10 A.    That I could find, in my opinion.
11 Q.    And the highlighted words that you do in the
12 police reports are your drawing significance to that?
13 A.    Yes.
14 Q.    Let's take the one officer, Badua.  And I'm
15 talking now in terms of medical significance.  You see
16 that Officer Badua, you've highlighted words, looks like,
17 to the effect --
18 A.    What page are you?
19 Q.    I'm sorry.  Page 13.
20 A.    Go on.
21 Q.    I noticed that you are focusing on, looks like
22 the words about being invited in.  I don't mean to
23 overstate it.  But looks like that's the purpose of
24 drawing emphasis to that in Badua knocks on the door and
25 she invited him in, words to that effect.

52

1  A.    That's his account.
2  Q.    You are putting that into emphasis because you
3  want to make it clear that his opinion that he was invited
4  in?
5  A.    Yes.
6  Q.    You understand Ms. Coloyan says that that didn't
7  happen?
8  A.    Yes.
9  Q.    You certainly picked that up from your interview
10 of her?
11 A.    Well, it's throughout my history of present
12 illness.  And it's also referred to and also highlighted
13 as this is highlighted in her deposition.
14 Q.    Now, you've also made it clear that you don't
15 believe Ms. Coloyan is intentionally misrepresenting
16 facts?
17 A.    That's correct.
18 Q.    Are you suggesting then that she did do what Mr.
19 Badua is saying she did but just forgot about it because
20 of the exigency of the situation?
21 A.    I wasn't there so I don't know.  But I think
22 there's a very significant possibility that that occurred
23 based on the other mistakes she made about what occurred,
24 like the number of police officers that were in her house,
25 whether they just came in or invited themselves in, and

53

1    some of the other inconsistencies that I referred to.

2    Q.        Are there any other inconsistencies that you

3    haven't referred to that were on your mind to help you

4    want to highlight these words?

5    A.        Not that I can think of.

6    Q.        Now, you were given the entire depositions of all

7    these officers, right?

8    A.        Yes.

9    Q.        And yet you selected just these portions.  And, I

10   take it, you selected these portions for a reason?

11   A.        Yes.

12   Q.        And what was that reason?

13   A.        I thought they were relevant to the questions

14   being asked.

15   Q.        Meaning?

16   A.        Meaning were they invited in or did they go in

17   uninvited.  And I was looking, as I said, to see if there

18   was consistency in their account.

19   Q.        Have you done cases involving police officers

20   before where there's a number of police officers

21   testifying about a particular incident?

22   A.        Yes.

23   Q.        And have you found -- Have you ever heard of a

24   term called the code of silence?

25   A.        Yes.

HONOLULU REPORTING SERVICES

54

1    Q.        What do you understand --

2              MS. KAWAI:  Objection.  Relevance.  Just for the

3    record.

4    BY MR. SCHWEIGERT:

5    Q.        What do you understand the code of silence to be?

6              MS. KAWAI:  Same objection.  Sorry.

7              THE WITNESS:  The code of silence occurs in all

8    kinds of settings.  When there are groups of people

9    working together in which people agree not to acknowledge

10   that something has occurred, or to portray as having

11   occurred that didn't.  They agree to the same account.

12   That happens on the waterfront.  It happens in the

13   military.  It happens with police officers.  This kind of

14   phenomena occurs in a variety of settings.

15   BY MR. SCHWEIGERT:

16   Q.        For purposes of evaluating these police officers'

17   testimony, did you interview any of these police officers?

18   A.        No.

19   Q.        Did you do any other reports about this

20   particular incident but for those documents you've

21   identified in your report?

22   A.        No.

23   Q.        I also picked up that you looked at this lady as

24   a hard working lady.  Is that a fair statement to make?

25   A.        I would say she's a very hard working lady.

HONOLULU REPORTING SERVICES

55

1    Q.        In fact, the night after having had this

2    experience with the police she's still going to work the

3    next morning and refusing hospitalization that night?

4    A.        Yes.

5    Q.        What do you draw as far as any significance from

6    that as far as the kind of grit that this lady might have?

7              MS. KAWAI:  Objection.  Vague and ambiguous.

8    BY MR. SCHWEIGERT:

9    Q.        Do you have any question about my question?

10   A.        Well, just to take it a step further.  At one

11   point she was working two 40 hour a week jobs and stopped

12   because the strain was too great.  And, as you say, she

13   went to work the next day even though she was very upset.

14   I take that to be a reflection of her determination and

15   her conscientiousness about her work.  And I think at that

16   point grit is a good word.

17             And at that point I don't think she realized how

18   much this incident affected her.  I don't think she needed

19   hospitalization.  Her husband thought she probably should

20   stay home.  She found as a matter of fact she wasn't up to

21   going to work.

22   Q.        If she would have come to you that day would you

23   have told her to stay home in view of the symptoms that

24   she's describing?

25             MS. KAWAI:  Objection.  Calls for speculation.

HONOLULU REPORTING SERVICES

56

1              THE WITNESS:  Given the symptoms, can't sleep,

2    I'm worried, I can't concentrate.  Particularly telling,

3    her not being able to keep her mind on her work.  A person

4    can do a lot if they're not sleeping well, if they're not

5    eating well.  But once your thinking becomes affected so

6    that you can't concentrate, then I think it's hard to do

7    an effective job.

8    BY MR. SCHWEIGERT:

9    Q.        So there's no doubt about it in your mind that

10   she did suffer an adjustment disorder as a result of this

11   incident?

12   A.        There's no doubt.

13   Q.        And that includes from the police actually going

14   through her home?  I know you've ranked it third on the

15   list.  But certainly one of the things that she suffered

16   an adjustment disorder from was the police going through

17   her house?

18   A.        I would say that that was a minor element, but it

19   was certainly one of them.

20   Q.        So it does fall within the number of those things

21   that contributed to her adjustment disorder that you're

22   seeing when you saw her August, I guess, of 2005?

23   A.        Yes.

24   Q.        You put it at the bottom of the list?

25   A.        Yes.

HONOLULU REPORTING SERVICES

57

1    Q.    But now you're forming an opinion based on her
2    statements to you during this interview that seem to
3    concentrate in large part about her son as to why you are
4    putting the son at the top of the list?
5    A.    It was her statements and the manner in which she
6    made them, the feeling that was in her voice and in her
7    demeanor, the number of times that she came back to that
8    as a primary issue for her, the way in which it affected
9    her relationships with people she was close to.  All of
10   that.
11   Q.    Now, as you're doing this interview, Doctor, help
12   me with this, are you doing this interview -- These are
13   your questions and her answers, right?
14   A.    (Witness nods head.)
15         There is a live you talking to her kind of an
16   interview as far as developing this history and drawing
17   upon the fact that she seems to be in large part hurt
18   about the son?
19   A.    Yes.
20   Q.    So how long would that interview have lasted?
21   A.    About two to two and a half hours.
22   Q.    And this is the live interview between you and
23   her?
24   A.    Yes.
25   Q.    And during this two and a half hours she's

58

1    talking about the incident, is she talking about it like
2    it's just happened, or is she talking about it like it's
3    now two and a half years later?
4    A.    Somewhere in between.
5    Q.    She's not coming to you like she went to Dr. Lum
6    for immediate treatment?
7    A.    No.  Sometimes people come in and give an account
8    of something that's happened two years ago and there is a
9    quality about it as though it happened yesterday.
10   Q.    Did you pick that up --
11   A.    But that was not the indication with her.
12   Q.    She's basically -- --
13   A.    So she's put some distance between herself and
14   the incident.  At the same time, it had a freshness to it,
15   a vividness to it that was, didn't seem like it was two,
16   two and a half years ago.
17   Q.    Did you see she's still suffering from it?
18   A.    No.  Well, when she talks about it she
19   experiences distress, and other times she doesn't.  So
20   that she said, for instance, that she was upset at the
21   prospect of coming to this interview with me.  And
22   reminders of something that's been unpleasant.  That
23   doesn't mean she's suffering on an ongoing basis.
24         When something arises like this interview where
25   she's going to go into detail, it causes her to become

59

1    upset again, not to the same degree, of course, as at the
2    time that this first occurred.  I mean, she wasn't saying
3    I couldn't eat, I couldn't concentrate, I couldn't work.
4    She was saying I was upset.
5    Q.    I missed that.  I'm sorry.
6    A.    I wanted to differentiate between the intensity
7    and the effect of her emotional disturbance when she was
8    suffering from an adjustment disorder at the time that it
9    occurred where she couldn't sleep, her appetite was
10   affected, she couldn't concentrate, she couldn't work, she
11   was shaky.
12   Q.    At that point she's in adjustment disorder
13   period?
14   A.    Yes.  When she came to me she was again
15   emotionally upset, but it was in her distress.  She was
16   not -- It was not nearly the kind of distress that was
17   present at the time when she had the adjustment disorder.
18   I don't want to give the false impression that a reminder
19   such as coming to this interview re-evoked the whole
20   illness all over again.  It's just an unpleasant memory.
21   Q.    Be like that neighbor situation where you talked
22   about where you are able to, it would be a bad thing that
23   happened to you, but for your neighbor there was an
24   actual -- Let's scratch that.
25   A.    Okay.

60

1    Q.    I don't think I'm going the right spot on that.
2    A.    But you got the idea.
3    Q.    I got the idea.  Thank you, Doctor.
4          You looked at Dr. Lum's records, right?
5    A.    Yes.
6    Q.    Okay.  You have him then basically letting her to
7    return to work within two weeks, according to your notes?
8    A.    Yes.
9    Q.    Can you take a look -- We'll mark these next in
10   order.  I don't have the full set of documents, but enough
11   to be able to get through this part.  Your copy, we'll
12   mark that as Exhibit 2 for this depo.
13   MS. KAWAI:  Yes.
14   BY MR. SCHWEIGERT:
15   Q.    We'll draw your attention down there.  I just
16   attached four pages because it looks like four pages would
17   get us through this particular task.  You notice that
18   there's a June 4th entry, 2003?
19   A.    Yes.
20   Q.    Now, you remember looking at these records.  Does
21   this look like the records that you looked at, a portion
22   of those records you looked at from Dr. Lum?
23   A.    Yes.
24   Q.    Now, you notice you weren't there.  She didn't
25   come to you for treatment.  She goes to her doctor.  I

61

1    guess that's the doctor she's always gone to. And she
2    doesn't mention anything about her son in this report to
3    the doctor. Do you have any explanation of why that would
4    be so in view of what you were picking up two years later?
5        MS. KAWAI: Objection. Calls for speculation.
6        MR. SCHWEIGERT: Okay.
7    Q.    You see what I'm saying, Doctor?
8    A.    Yes.
9    Q.    Your explanation for why she would not mention
10   what you picked up with the preoccupation of her son?
11   A.    She was deeply embarrassed and humiliated to the
12   point she wouldn't talk about this with her brothers and
13   sisters. I think she probably had the same feelings to
14   even a greater extent with her, with Dr. Lum. So instead
15   it was probably more -- less upsetting to her to just say
16   there was trouble with police instead of being specific
17   and saying my son is wanted for arrest on drug charges.
18   It would be much more difficult to acknowledge.
19   Q.    That would be your speculation as to why she
20   didn't do it?
21   A.    That's my speculation. That's a reasonable one.
22   Q.    Would you say to a reasonable degree of medical
23   certainty that is a fact?
24   A.    No.
25   Q.    Then you noticed that at this point in time she

62

1    is given some drugs. Is Diazepam valium?
2    A.    Yes.
3    Q.    Did you see her being given valium as a common
4    drug or is this something that's specific for this
5    particular episode in her life, this giving her of
6    Diazepam to treat her anxiety?
7        Did you notice from reviewing her records up to
8    this point in time, June 4th, she'd been given Diazepam as
9    a regular course of treatment for whatever might be ailing
10   her? Do you understand my question?
11   A.    Yes.
12       MS. KAWAI: Objection. Lacks foundation.
13   BY MR. SCHWEIGERT:
14   Q.    Is it fair to say this is the first time you see
15   Diazepam being prescribed for anxieties that you can
16   recall?
17   A.    I don't remember. In any event, it's an
18   appropriate medication to prescribe for anxiety and
19   sleeplessness. And it's commonly used for that purpose.
20   Q.    And the doctor is -- It's not suggesting, is it?
21   It's just an actual directive, no work for the next three
22   days? You read that as a directive?
23   A.    No, I don't know whether that's a directive or a
24   summary.
25   Q.    For whatever it is in his notes as the period of

63

1    time he thinks she should stay away from work?
2    A.    Or a conclusion that she stayed away for three
3    days.
4    Q.    From what you read of these symptoms does that
5    seem like appropriate form of treatment?
6    A.    Yes.
7    Q.    Now, the next treatment that I see is June 9th.
8    Is that what your records reflect?
9    A.    Yes.
10   Q.    And again I see she's taking valium. I guess
11   this is again for her anxiety?
12   A.    And to help her sleep.
13   Q.    And to help her sleep. Does she mention anything
14   in here about anything about her son?
15   A.    No. There's no mention of her son, the police,
16   her neighbors. Just symptoms.
17   Q.    Now, does the doctor make -- I see that he's got
18   this A, P. Do you see the A, P on the left margin there?
19   A, headache, HTN. P, got some other words. Do you know
20   what A is in this doctor's notes? You see the A?
21   A.    I think A probably stands for assessment.
22   Q.    Okay. Is that part of the old SOP outline?
23   A.    Yes.
24   Q.    And so his assessment was headaches and HTN. Do
25   you know what that is?

64

1    A.    Hypertension probably.
2    Q.    Did you notice whether she had suffered from
3    hypertension as a regular course of problems for
4    Ms. Coloyan or something that's being brought on by this
5    episode with the police?
6        MS. KAWAI: Objection. Calls for speculation.
7    Lacks foundation.
8        THE WITNESS: The records reflect that she had
9    hypertension as far back as April 2003, and possibly even
10   before that.
11   BY MR. SCHWEIGERT:
12   Q.    Did you see before this, like within months of
13   this incident, two months or three months before this
14   incident, from your notes, did you see that she was
15   suffering from hypertension?
16   A.    Yes.
17   Q.    When was the most recent before June 3rd that you
18   see her suffering from hypertension?
19   A.    The previous visit, May 22nd, the one before
20   that, April 17th, and the one before that, April 1st.
21   Q.    And is she prescribed valium for that
22   hypertension?
23   A.    No. She's prescribed a specific
24   anti-hypertensive medication.
25   Q.    So is she basically a hypertensive lady, is that

65

1  what you're picking up from these notes?
2  A.        She has preexisting hypertension, and it's
3  severe.
4  Q.        And it's severe?
5  A.        Uh-huh.
6  Q.        And she's been treated for it for a while?
7  A.        Yes.
8  Q.        Is that why you in the end concluded for this
9  person these things could have caused all the more
10  problems?  Do you know what I'm talking about?
11  A.        I don't think they're related.  I think this
12  incident would have caused her all the more difficulty
13  because of her temperament, her need to present herself in
14  an excessively good light, as reflected in the MMPI, her
15  high standards for herself, her sensitivity.
16  Q.        What other people think about her, such as her
17  neighbors or her family, all of those things would have
18  made it more upsetting to her than the average individual?
19  A.        I don't think any of those things are related to
20  her hypertension.
21  Q.        Now, I notice though then that she's still
22  prescribed the valium on this June 9th visit?
23  A.        Yes.
24  Q.        And now, correct me if I'm wrong, this seems to
25  be the doctor making a direct -- Do you know what P stands

66

1  for?
2  A.        Plan, I think.
3  Q.        So his plan is I do not feel she's capable of
4  returning to work at this time.  That seems to be the
5  doctor's own notes.  Is that what you --
6  A.        That looks to be his opinion.
7  Q.        And he's actually saying I want her to stay off
8  work for at least one, I'm assuming one more week?
9  A.        It looks that way.
10  Q.        Now, that makes two weeks that she's missed so
11  far?
12  A.        June 3rd to June 16th.
13  Q.        So it's two weeks?
14  A.        Yes.
15  Q.        Now, she comes again on June 13, it looks like
16  recheck?
17  A.        Yes.
18  Q.        And I notice on this one that at the end of it
19  he's writing, and again it's under the P, so we've
20  identified we think to be plan, he's saying I feel she
21  should stay off work for this one week and if doing well
22  return next week.  And he's writing that, it appears to be
23  on June 23rd.  Does that seem right to you?
24            MS. KAWAI:  Objection.  Misstates the document.
25  BY MR. SCHWEIGERT:

67

1  Q.        I'm looking at June 22nd, 23rd, 03.  Is that what
2  you are looking at that to be, Doctor?
3            MS. KAWAI:  Objection.  Calls for speculation.
4  BY MR. SCHWEIGERT:
5  Q.        Do you have any idea what he's talking about?
6  A.        I thought that was all part of the June 13th
7  note.  I was confused by the writing in there, June 4th,
8  and then there's BTW, 6-23-03, and then 6-22-03.  I didn't
9  quite know what to make of that.
10  Q.        You interpreted that to be up at the June 13th
11  note?
12  A.        Yes.
13  Q.        And didn't qualify that you really weren't sure
14  about that because it could very well be another entry?
15  A.        I wasn't sure at the time.
16  Q.        Anyway, he's saying, according to his notes, he
17  wants her to stay at home for one more week at least?
18  A.        It looks as though he wants her to stay home for
19  a week after -- The way I interpret that, as of June 13th,
20  which would put her back to work by the 20th.
21  Q.        You're aware she actually had a doctor's note,
22  I'm sure it's been shown to you, where she stays out for a
23  full three weeks.  Did you ever see that document in the
24  documents that were given to you?
25  A.        I don't remember.

68

1  Q.        But staying out three weeks for this kind of
2  adjustment disorder would not seem unreasonable?
3  A.        No.
4  Q.        In fact, knowing her psyche, probably other
5  people might have stayed out longer, but she's the kind of
6  person that wants to get back to work?
7  A.        I think most people would have gone back to work
8  the next day which wouldn't have been as traumatized or
9  upset by this.  She's a more emotional, reactive
10  individual, which doesn't take away from her grit and
11  determination.  I think she has a tendency to think about
12  things, to worry a lot more.  She's a little more upset
13  than the average individual.
14  Q.        Did you ever see in the notes where the doctor,
15  Dr. Lum is prescribing her valium for anything other than
16  this disorder, this adjustment disorder, as a result of
17  this incident?
18  A.        I don't remember.
19  Q.        So do you see on July 11th a prescription for
20  valium?
21  A.        Yes.
22  Q.        Did you draw any significance from that?
23  A.        She may still have been having some difficulty
24  sleeping.
25  Q.        Would that have been attributable to this

69

1  adjustment disorder?

2  A.        Possibly and possibly not.  Because she makes no

3  reference to the problems with the incident on the 3rd.

4  And she's had valium in the past for problems with sleep.

5  She has a long history of difficulty with sleep and/or

6  sleeplessness.  Or has had, as I recall -- I'm not certain

7  whether she's had valium in the past or not, but she's had

8  problems with sleep in the past.

9  Q.        There was valium being given for anxiety?

10  MS. KAWAI:  Objection.  Calls for speculation.

11  BY MR. SCHWEIGERT:

12  Q.        Is it fair to say you don't know what that

13  prescription for valium was meant to treat?  If you do,

14  I'd like to know what your opinion is.

15  A.        No, I don't.

16  Q.        And do you see on July 24th there's again a

17  mention of valium at night as needed for insomnia?

18  A.        Yes.

19  Q.        Do you have any idea that this would not be as a

20  result of the adjustment disorder that she suffered from?

21  A.        It could have been related to the adjustment

22  disorder or it could have been related to something else.

23  We don't know.

24  Q.        Don't know?

25  A.        (Witness nods head.)

70

1  Q.        Now, when she's talking to you, Doctor, about her

2  son, you're saying she's talking about it not in the

3  format of an adjustment disorder anymore?  You've got her

4  cured from that adjustment disorder, right?  Would you say

5  she's cured from that adjustment disorder?

6  A.        Yes.

7  Q.        But yet you mention in your report in places like

8  she still seemed to talk about hearing noises outside and

9  being alarmed at that.  Have I got your report correct?

10  Do you remember making mention of that?  There were

11  different things, like she worried about sounds outside

12  and she worried about things that, slight noises at night.

13  Look at page 4, Doctor.  Slight noises at night awaken

14  her.  She's made statements someone might be watching.

15  A.        Which paragraph?

16  Q.        First paragraph.  I'm so sorry.

17          How long did those slight noises at night still

18  awaken her?  Do you know where I'm at, Doctor?

19  A.        Yes.  I didn't ask her, so I don't know how long

20  she was being awaken by slight noises.  She said that she

21  was upset by strange cars or rather -- Yeah, I'm looking

22  at the sentence beyond that.  When a strange car would

23  drive into her cul-de-sac, pause for a moment, and then

24  drive out again, she was concerned that someone might be

25  watching to see whether her son Allan had returned.  She

71

1  said that lasted for several months.

2  Q.        Did she put a number on that month?  Could have

3  been a year?

4  A.        She said a few months.  Not a year.

5  Q.        Does that seem like what we're talking about,

6  slight noises waking her up and statements about someone

7  might be watching, these are her words, right?

8  A.        Yes.

9  Q.        So that --

10  A.        It's consistent with that.  But she didn't say

11  those things had lasted for several months.  The thing

12  that bothered her, that someone might be coming to look

13  for her son Allan.

14  Q.        But you made a note about slight noises at night

15  awaken her.  I'm assuming you drew enough significance

16  from that statement to put it in your report?

17  A.        Yes.

18  Q.        That was of some significance?

19  A.        Certainly.

20  Q.        Were you keeping that thought in mind that she is

21  awakened by noises outside, did you draw any significance

22  from the fact of how she opened the door when there's that

23  loud pounding by the police?  Do you remember her

24  statements when she was asked why she would open the door

25  to loud pounding?  Do you remember her saying something to

72

1  the effect she doesn't have an enemy in world, she wasn't

2  worried about things?

3  A.        Yes.

4  Q.        Did that stick in your mind that she said such a

5  thing?  Here's a woman alone in her home at night, loud

6  bounding on the door, willing to open the door.

7  A.        That surprised me.

8  Q.        That surprised you.  Now, she's the kind of woman

9  who hears slight noises at night and she's awaken by that?

10  A.        I think you are kind of overdrawing it when she's

11  the kind of woman.  As you know, there's been this kind of

12  far reaching change in her personality from someone who is

13  without, in fact what I would say the usual kind of

14  caution in opening the door to strangers pounding on it in

15  the night to being alarmed by strange cars.  But she had a

16  specific issue on her mind, and that was the safety, or

17  rather the status of her son.

18  Q.        Now, this would be your talking to her -- What

19  was the date of your exam, July -- August -- I'm sorry.

20  A.        July 12th, 2005.

21  Q.        So almost a little over two years from the day of

22  the incident?

23  A.        Yes, yes.

24  Q.        You're aware that her son actually came back to

25  town and went to the police station within a couple of

73

1  months, and there was no warrant at the Kalihi police
2  station for him? Are you aware of that?
3  A.      It's in my report.
4  Q.      And yet she's telling you to this date this was
5  the most important thing on her mind as she is talking to
6  you?
7  A.      At this time. Not at this time. Not at the time
8  she's being examined by me.
9  Q.      It seems like the most important stressor to you,
10  as I picked up your testimony, is she's telling you her
11  accounting of the events?
12  A.      At the time that the events occurred, yes.
13  Q.      How much time have you spent on this case so far?
14  A.      I've spent about two to three hours preparing for
15  today. And about eighteen hours and ten minutes to
16  prepare the report.
17  Q.      Now, you mentioned that you worked with police
18  officers on other occasions?
19  A.      Yes.
20  Q.      Can you give me -- Who hired you at that point in
21  time? How many times was this, first of all?
22  A.      There have been, I would say, about four or five
23  times over the years that I worked evaluating policemen.
24  Q.      Can you give me the circumstance that you would
25  have been working? Would it have been the city that hired

HONOLULU REPORTING SERVICES

74

1  you to evaluate a police officer, or was it a civil rights
2  case where someone is going after a police officer? Or
3  what would be the circumstances?
4  A.      Some of them were for injuries.
5  Q.      On the job type?
6  A.      Yes. Workers' compensation type injuries,
7  emotional aspect of a physical injury or specific
8  emotional trauma as a result of something that happened on
9  the job. There have been a couple of cases where someone
10  was suing the city and county and I examined them. But I
11  didn't examine the police involved. But there were police
12  involved. And I don't remember the specifics of it.
13  Q.      Did you put the different police reports in that
14  report as you recall?
15  A.      I don't remember.
16  Q.      Aside from those two cases, can you think of any
17  other case where you've been involved with police?
18  A.      As I said, there are probably, but my memory
19  really isn't good on this.
20       MR. SCHWEIGERT: Thank you very much, Doctor.
21  Let me just take one quick look at my notes because I'm
22  catching this -- You're going to give me -- You have your
23  results of the MMPI. They were in there?
24  A.      Yes.
25  Q.      And can different doctors look at MMPI's and come

HONOLULU REPORTING SERVICES

75

1  up with different conclusions?
2  A.      Yes. And the method I use is as follows. The
3  MMPI, the Minnesota Multiphasic Personality Inventory, is
4  a psychological test, paper and pencil, with yes and no
5  answers. Consists of 567 questions. And it's the most
6  widely used psychological test in the world. And it's
7  used in all kinds of settings for psychiatric emotional
8  illness, for forensic settings, for personnel. Has many
9  uses.
10       It was developed at the University of Minnesota
11  by a man named Butcher. And Dr. Butcher and his
12  associates have a system for scoring and interpreting the
13  MMPI. And it's their system that I rely on for
14  interpreting and evaluating MMPI's. Other doctors can
15  administer the 567 questions, look at the answers and have
16  their own interpretations. And there may be variation.
17  However, the method I use is the most widely used among
18  mental health professionals.
19  Q.      Let me ask it this way. On your Axis I you draw
20  a conclusion that she is now in complete remission. This
21  is the anxiety disorder?
22  A.      The adjustment disorder, that's right.
23  Q.      Thank you.
24       And so if a loud noise outside now startles to
25  the extent to go look and see what it is, or there are

HONOLULU REPORTING SERVICES

76

1  other neighborhood disturbances, knowing the kind of
2  person she was, are you saying to a reasonable degree of
3  medical certainty that you know she's in complete
4  remission, she's not suffering from like the event
5  happening?
6       Let me put it another way, Doctor. Suppose
7  someone was to come pound on her door right now. Startles
8  the living daylights out of her. Would you say that that
9  would be at all something to do from this particular
10  incident with the police or just a totally new incident?
11       MS. KAWAI: Objection. Calls for speculation.
12  BY MR. SCHWEIGERT:
13  Q.      You know what I'm saying? She still has trouble
14  this way. And I want to know whether your conclusion
15  she's totally in remission, and whatever trouble she's
16  having today would not have been caused by this incident
17  from June the 3rd?
18       MS. KAWAI: Same objection.
19       THE WITNESS: I can only speculate. She had
20  trouble sleeping for years before this. And I don't know
21  whether she was disturbed by noises that time too. I
22  didn't ask her. That might have been the reason for
23  sleeplessness in the past.
24       At the present time if someone were to bang on
25  her door, not in the middle of the night, 7 p.m. is hardly

HONOLULU REPORTING SERVICES

77

1   that, but still, if someone were to bang on her door, my
2   hunch is, and this is a speculation, she would have looked
3   to see who it was first.  And if it were police, she would
4   probably be frightened again, just as she was the first
5   time.  Depending on what they were there for, she would
6   probably settle right down, or might have a major upset.
7   We don't know.  It's a lot of speculation.
8          But I don't believe that she has been scarred
9   emotionally in such a way so that any kind of reminder is
10  going to re-evoke the adjustment disorder such as occurs
11  in post-traumatic disorders where a veteran hears a car
12  backfire, thinks he's back in Vietnam, and dives under a
13  car for cover.  It's nothing like that.
14         As she said, when she has reminders she gets
15  upset for a while, like when she got a reminder to come to
16  this interview, and then it passes.
17         MR. SCHWEIGERT:  Thank you very much, Doctor.
18  We're done.
19         THE VIDEOGRAPHER:  We're off the record and the
20  end of the deposition at 4:49.
21         (Exhibits 1 & 2 were marked for identification.)
22
23
24
25
                 HONOLULU REPORTING SERVICES

78

1     I, BYRON ELIASHOF, M.D., do hereby certify that I have
2   read typewritten pages 1 through 77, inclusive, and
3   corrections, if any, were noted by me and the same is now
4   a true and correct transcript of my testimony.
5     Dated: _____.
6
7
8
9          _____
           BYRON ELIASHOF, M.D.

10  Signed before me this _____
11  day of _____2006.
12  _____
13
14
15
16
17
18
19
20
21
22
23
24
25
                 HONOLULU REPORTING SERVICES

79

1   STATE OF HAWAII            )
2                              ) SS.
    CITY AND COUNTY OF HONOLULU   )
3       I, SHEILA BRITT LIPTON, CSR NO. 257, Notary Public
4   in and for the State of Hawaii, do hereby certify:
5       That on February 23, 2006, 2:35 p.m. appeared
6   before me BYRON ELIASHOF, M.D., the witness whose
7   deposition is contained herein; that prior to being
8   examined, the deponent was by me duly sworn; that the
9   deposition was taken in machine shorthand by me and was
10  thereafter reduced to typewriting under my supervision;
11  that the foregoing represents, to the best of my ability,
12  a correct transcript of the deposition had at that time;
13      That the deponent was notified through counsel, by
14  mail or by telephone to appear and sign; that if the
15  deposition is filed without signature, either the reading
16  and signing of the deposition were waived by stipulation
17  of all parties or the deponent has failed to appear, and
18  the deposition is therefore filed pursuant to Rule 30(e),
19  Hawaii Rules of Civil Procedure.
20
21      Date: _____
22
23
24          _____
25          SHEILA BRITT LIPTON, CSR NO. 257
            Notary Public, State of Hawaii
            My Commission Expires: 5-9-2009

            HONOLULU REPORTING SERVICES

| **$** | **2:57** [1] - 16:1 | **9th** [2] - 63:7, 65:22 | 24:15, 25:8, 25:18, | **AND** [1] - 79:2 |
|---|---|---|---|---|

**$**

**$450** [1] - 13:19

**0**

**03** [1] - 67:1

**1**

**1** [4] - 3:16, 17:6, 77:21, 78:2
**10** [2] - 43:20, 49:9
**100** [1] - 8:5
**1000** [1] - 1:19
**10th** [2] - 17:19, 45:9
**11** [2] - 3:8, 47:1
**11th** [1] - 68:19
**12** [3] - 12:1, 12:23, 13:4
**12th** [4] - 17:9, 17:15, 17:18, 72:20
**13** [2] - 51:19, 66:15
**13th** [3] - 67:6, 67:10, 67:19
**1509** [2] - 1:12, 4:13
**16th** [1] - 66:12
**17** [1] - 3:16
**17th** [1] - 64:20
**1956** [1] - 4:20
**1961** [1] - 4:22
**1965** [1] - 5:12
**1967** [1] - 14:15
**1st** [1] - 64:20

**2**

**2** [4] - 3:17, 27:16, 60:12, 77:21
**20** [3] - 8:19, 10:11, 12:7
**20/80** [1] - 13:7
**200** [1] - 7:21
**2003** [3] - 32:8, 60:18, 64:9
**2005** [6] - 17:9, 17:19, 43:20, 45:9, 56:22, 72:20
**2006** [3] - 1:13, 78:11, 79:5
**20th** [1] - 67:20
**22nd** [2] - 64:19, 67:1
**23** [2] - 1:13, 79:5
**23rd** [2] - 66:23, 67:1
**24th** [1] - 69:16
**25** [1] - 6:24
**257** [3] - 1:16, 79:3, 79:23
**2:35** [2] - 1:12, 79:5
**2:53** [1] - 15:24

**3**

**3** [1] - 29:2
**30(e** [1] - 79:18
**309** [1] - 2:3
**34** [3] - 48:1, 48:4, 48:5
**35** [3] - 33:6, 33:11, 33:16
**3:38** [1] - 37:4
**3:46** [1] - 37:6
**3rd** [5] - 32:8, 64:17, 66:12, 69:3, 76:17

**4**

**4** [4] - 3:5, 27:20, 29:6, 70:13
**40** [1] - 55:11
**401** [1] - 1:19
**43** [1] - 3:6
**4:49** [1] - 77:20
**4th** [2] - 60:18, 62:8, 67:7

**5**

**5-10** [1] - 1:7
**5-9-2009** [1] - 79:24
**524-6288** [1] - 1:21
**530** [1] - 2:7
**550** [1] - 2:2
**567** [2] - 75:5, 75:15

**6**

**6-22-03** [1] - 67:8
**6-23-03** [1] - 67:8
**60** [1] - 3:17
**615** [2] - 1:11, 4:13
**65** [1] - 11:19
**675** [2] - 13:12, 13:16

**7**

**7** [1] - 76:25
**75** [1] - 24:10
**77** [1] - 78:2

**8**

**80** [5] - 8:5, 8:18, 10:14, 12:7
**808** [1] - 1:21

**9**

**90** [1] - 8:5
**96813** [3] - 1:20, 2:3, 2:7

**A**

**ability** [4] - 25:19, 25:20, 25:21, 79:11
**able** [7] - 34:15, 38:3, 38:12, 41:22, 56:3, 59:22, 60:11
**Academy** [2] - 8:22, 9:15
**access** [1] - 41:15
**accidents** [1] - 19:22
**accomplish** [1] - 33:24
**according** [9] - 29:3, 31:12, 32:19, 32:20, 36:8, 37:15, 38:20, 60:7, 67:16
**According** [1] - 36:15
**account** [1] - 36:11, 39:8, 39:12, 49:20, 50:1, 50:3, 50:15, 52:1, 53:18, 54:11, 58:7
**accounting** [3] - 49:24, 73:11
**accuracy** [5] - 41:5, 49:20, 50:16, 50:20, 50:24
**acknowledge** [2] - 54:9, 61:18
**acknowledged** [2] - 26:14, 34:2
**acknowledgment** [1] - 34:4
**action** [1] - 33:25
**active** [1] - 5:13
**actual** [2] - 59:24, 62:21
**add** [2] - 21:18, 22:4
**added** [2] - 36:12, 37:18
**addiction** [1] - 14:8
**Adding** [1] - 22:11
**adding** [1] - 29:3
**addition** [7] - 5:18, 28:10, 29:10, 32:9, 35:3, 39:6, 51:2
**additional** [6] - 5:3, 16:21, 18:23, 21:18, 22:11, 30:24
**address** [3] - 4:11, 4:12
**addressed** [1] - 9:9
**adequately** [1] - 26:14
**adjustment** [31] - 5:25, 23:16, 24:13,

25:23, 26:5, 27:1, 27:6, 28:21, 30:13, 31:2, 34:6, 35:11, 56:10, 56:16, 56:21, 59:8, 59:12, 59:17, 68:2, 68:16, 69:1, 69:20, 69:21, 70:3, 70:4, 70:5, 75:22, 77:10
**administer** [1] - 75:15
**adolescents** [2] - 7:6, 7:7
**adults** [2] - 7:5, 7:7
**advised** [1] - 20:24
**affected** [5] - 27:13, 55:18, 56:5, 57:8, 59:10
**affects** [1] - 20:19
**afraid** [1] - 27:23
**afternoon** [1] - 4:10
**afterwards** [1] - 44:19
**aggressive** [1] - 26:10
**ago** [6] - 11:16, 11:17, 11:24, 12:13, 58:8, 58:16
**agree** [2] - 54:9, 54:11
**agreed** [1] - 23:3
**agreement** [5] - 16:2, 22:15, 22:19, 23:2, 34:24
**ahead** [1] - 33:19
**ailing** [1] - 62:9
**alarmed** [2] - 70:9, 72:15
**Alaska** [6] - 28:15, 37:11, 38:2, 38:3, 38:7, 39:23
**Albert** [1] - 4:21
**Allan** [6] - 22:21, 29:5, 37:8, 37:20, 70:25, 71:13
**alleging** [1] - 6:10
**almost** [3] - 8:12, 47:6, 72:21
**alone** [2] - 35:24, 72:5
**ambiguous** [2] - 19:18, 55:7
**amended** [6] - 18:10, 18:24, 18:25, 19:1
**American** [7] - 8:22, 8:23, 9:13, 9:15, 9:21, 36:2, 41:19
**amount** [3] - 48:19, 48:24, 50:9

**AND** [1] - 79:2
**ANDERSON** [1] - 1:6
**Anderson** [1] - 19:7
**anger** [2] - 33:9, 33:15
**angered** [2] - 32:22, 37:9
**angry** [12] - 31:17, 31:22, 32:10, 32:15, 32:18, 32:24, 33:1, 33:7, 33:9, 33:13, 33:22, 38:18
**Annals** [1] - 9:14
**answer** [6] - 18:13, 19:20, 21:15, 32:4, 33:19, 46:5
**answers** [5] - 7:13, 19:3, 57:13, 75:5, 75:15
**anti** [1] - 64:24
**anti-hypertensive** [1] - 64:24
**anxieties** [1] - 62:15
**anxiety** [13] - 5:25, 7:9, 23:17, 24:14, 24:25, 25:9, 28:17, 47:10, 62:6, 62:18, 63:11, 69:9, 75:21
**anxious** [2] - 35:4, 38:15
**Anyway** [1] - 67:16
**apparent** [1] - 6:20
**appeals** [1] - 8:9
**appear** [3] - 18:15, 79:14, 79:17
**APPEARANCES** [1] - 2:1
**appeared** [2] - 35:1, 79:5
**appearing** [1] - 46:1
**appetite** [3] - 24:24, 34:14, 59:9
**appropriate** [2] - 62:18, 63:5
**April** [3] - 64:9, 64:20
**Archives** [1] - 9:14
**area** [8] - 6:7, 7:18, 9:20, 9:24, 12:6, 26:21, 33:5, 39:24
**areas** [5] - 6:8, 6:17, 6:18, 10:2, 26:20
**arises** [1] - 58:24
**arrest** [11] - 22:21, 24:19, 27:3, 28:7, 28:23, 29:19, 36:25, 38:7, 40:25, 42:19, 61:17
**arrested** [5] - 24:6, 28:15, 28:18, 30:10, 39:23

HONOLULU REPORTING SERVICES

articles [2] - 9:22, 9:24
ashamed [2] - 29:5, 37:20
aside [1] - 12:21
Aside [2] - 12:23, 74:16
aspect [2] - 23:11, 74:7
assessing [1] - 41:8
assessment [8] - 9:8, 17:2, 17:23, 24:9, 41:24, 43:2, 63:21, 63:24
assignment [2] - 16:17, 16:18
associates [1] - 75:12
Association [3] - 8:22, 8:23, 41:19
associations [1] - 8:20
assume [3] - 12:4, 36:17, 44:21
assuming [2] - 66:8, 71:15
attached [1] - 60:16
attend [2] - 9:1, 9:3
attended [1] - 4:21
attention [2] - 47:20, 60:15
attorney [2] - 10:15, 12:12
attorneys [2] - 10:16, 10:22
attributable [1] - 68:25
August [5] - 17:19, 43:20, 45:9, 56:22, 72:19
auto [1] - 19:22
available [1] - 22:8
average [4] - 11:11, 12:24, 65:18, 68:13
avoiding [1] - 31:8
awaken [5] - 70:13, 70:18, 70:20, 71:15, 72:9
awakened [1] - 71:21
aware [4] - 36:13, 67:21, 72:24, 73:2
axes [1] - 26:1
Axis [11] - 23:20, 23:25, 24:3, 24:8, 24:13, 26:3, 26:8, 26:18, 26:20, 26:23, 75:19

**B**

backfire [1] - 77:12
background [1] - 4:18
backup [2] - 22:23, 22:25
bad [1] - 59:22
badge [3] - 32:20, 36:19, 38:21
Badua [3] - 19:6, 32:19, 36:16, 37:15, 38:20, 51:14, 51:16, 51:24, 52:19
BADUA [1] - 1:6
Badua's [2] - 19:2, 19:4
bang [3] - 76:24, 77:1
banging [1] - 36:3
bank [1] - 6:16
base [1] - 12:25
Based [2] - 16:2, 34:19
based [9] - 17:20, 17:22, 27:8, 34:25, 43:2, 50:10, 50:18, 52:23, 57:1
basic [1] - 16:12
basis [9] - 9:11, 13:5, 13:8, 27:5, 29:1, 30:16, 43:6, 58:23
became [8] - 31:16, 31:22, 32:18, 32:23, 32:25, 35:3, 37:9, 38:18
become [1] - 58:25
becomes [1] - 56:5
BEFORE [1] - 1:16
began [3] - 16:11, 37:25, 40:2
begun [1] - 15:13
behalf [2] - 1:11, 4:4
behave [1] - 26:16
behavior [1] - 30:4
behind [2] - 36:10, 51:4
belong [1] - 8:21
best [2] - 14:23, 79:11
between [6] - 17:14, 42:14, 57:22, 58:4, 58:13, 59:6
Beyond [1] - 5:16
beyond [4] - 18:15, 33:4, 33:15, 70:22
big [1] - 37:17
bipolar [2] - 7:11, 9:5
Bishop [1] - 1:19
bit [2] - 7:2, 32:1

board [7] - 5:4, 8:9, 13:25, 14:4, 14:6, 14:9, 14:14
body [3] - 27:10, 41:12, 42:4
bored [2] - 35:4, 35:7
bothered [1] - 71:12
bottom [1] - 56:24
bounding [1] - 72:6
break [2] - 10:11, 37:2
breakdown [1] - 8:18
briefly [2] - 16:22, 25:25
bring [1] - 16:4
BRITT [3] - 1:16, 79:3, 79:23
brothers [5] - 28:6, 29:13, 30:11, 31:9, 61:12
brought [1] - 64:4
BTW [1] - 67:8
business [1] - 4:11
Butcher [2] - 75:11
BY [24] - 3:4, 4:9, 11:6, 17:10, 18:17, 19:13, 19:19, 21:14, 22:1, 23:13, 29:23, 33:18, 43:14, 54:4, 54:15, 55:8, 56:8, 60:14, 62:13, 64:11, 66:25, 67:4, 69:11, 76:12
BYRON [5] - 1:10, 4:3, 78:1, 78:9, 79:6
Byron [1] - 4:12

**C**

capable [1] - 66:3
capacity [1] - 6:19
car [3] - 70:22, 77:11, 77:13
care [1] - 47:4
cars [2] - 70:21, 72:15
case [3] - 6:9, 14:16, 16:12, 23:19, 24:18, 26:5, 42:8, 47:10, 49:19, 50:13, 73:13, 74:2, 74:17
caseload [1] - 13:4
cases [5] - 10:17, 10:23, 53:19, 74:9, 74:16
Castle [1] - 18:8, 20:6
catching [1] - 74:22
categories [1] - 7:13
caused [4] - 21:21,

65:9, 65:12, 76:16
causes [2] - 24:11, 58:25
caution [1] - 72:14
cell [1] - 38:1
Center [2] - 4:23, 18:8
certain [3] - 22:9, 47:15, 69:6
certainly [4] - 35:5, 52:9, 56:15, 56:19
Certainly [1] - 71:19
certainty [2] - 61:23, 76:3
certified [6] - 5:5, 13:25, 14:4, 14:7, 14:9, 14:14
certify [2] - 78:1, 79:4
change [3] - 31:24, 44:6, 72:12
changed [2] - 7:6, 21:17
changes [1] - 42:3
changing [2] - 39:17
charge [3] - 13:12, 16:23, 16:24
charges [6] - 24:7, 24:20, 27:4, 28:24, 30:10, 61:17
child [2] - 14:8, 25:15
children [4] - 7:5, 28:1, 28:4, 29:15
chronic [1] - 6:1
chronically [1] - 26:13
circuit [1] - 8:7
circumscribed [1] - 26:6
circumstance [1] - 73:24
circumstances [1] - 74:3
CITY [1] - 79:2
City [1] - 2:6
city [4] - 10:23, 12:13, 73:25, 74:10
civil [5] - 8:11, 8:12, 8:15, 34:4, 74:1
CIVIL [1] - 1:3
Civil [2] - 1:13, 79:19
claimants [1] - 9:7
clear [3] - 42:18, 52:3, 52:14
clearly [2] - 25:22, 34:15
client's [1] - 43:18
clinical [1] - 9:4
close [3] - 28:9, 31:9,

57:9
code [3] - 53:24, 54:5, 54:7
College [1] - 4:21
Coloyan [23] - 6:9, 11:7, 16:19, 17:15, 17:17, 19:7, 19:23, 20:15, 22:10, 22:20, 23:4, 23:6, 24:18, 37:7, 44:22, 44:25, 45:15, 47:3, 48:15, 49:4, 52:6, 52:15, 64:4
COLOYAN [1] - 1:3
Coloyan's [1] - 49:20
combination [1] - 34:22
coming [6] - 32:20, 38:21, 58:5, 58:21, 59:19, 71:12
commencing [1] - 1:12
comment [1] - 44:9
Commission [1] - 79:24
committed [2] - 39:21, 40:17
common [2] - 25:11, 62:3
commonly [1] - 62:19
compensated [1] - 34:1
compensation [1] - 74:6
competence [2] - 6:20, 21:12
Competence [2] - 6:20, 21:19
complaining [1] - 20:21
complaint [6] - 18:10, 18:24, 18:25, 19:1, 39:17
complaints [2] - 18:11, 49:12
complete [3] - 46:15, 75:20, 76:3
completed [1] - 5:3
completion [1] - 15:8
compound [1] - 29:21
compulsive [1] - 7:11
concentrate [5] - 56:2, 56:6, 57:3, 59:3, 59:10
concentrating [1] - 38:14
concern [5] - 27:7,

28:18, 40:19, 42:23, 43:4

**concerned** [5] - 22:14, 28:4, 30:3, 39:20, 70:24

**concerns** [1] - 24:5

**concluded** [1] - 65:8

**concluding** [1] - 27:5

**conclusion** [4] - 34:20, 63:2, 75:20, 76:14

**conclusions** [1] - 75:1

**concurred** [1] - 21:2

**conduct** [1] - 25:20

**conducting** [2] - 23:14, 42:9

**conferences** [1] - 13:19

**confirm** [3] - 42:23, 43:3, 43:4

**confirmed** [1] - 34:23

**confirming** [1] - 15:17

**conflict** [1] - 44:16

**confused** [1] - 67:7

**conjunction** [1] - 20:5

**connect** [1] - 25:10

**conscientious** [1] - 20:7

**conscientiousness** [1] - 55:15

**consent** [1] - 43:18

**consider** [1] - 12:24

**consistency** [4] - 49:25, 50:11, 51:2, 53:18

**consistent** [5] - 20:10, 20:22, 22:15, 50:5, 71:10

**consists** [1] - 24:22

**Consists** [1] - 75:5

**consult** [1] - 10:7

**consulted** [2] - 10:10, 38:22

**consulting** [1] - 12:3

**contact** [2] - 37:15, 38:3

**contacted** [2] - 14:16, 14:18

**contacting** [1] - 38:4

**contained** [1] - 79:7

**continued** [3] - 15:12, 34:10, 34:12

**contradicted** [1] - 40:15

**contributed** [1] - 56:21

**conversations** [1] - 29:7

**cooperative** [1] - 38:2

**copies** [1] - 45:13

**copy** [3] - 15:10, 47:1, 60:11

**corporation** [1] - 10:16

**Corporation** [1] - 2:6

**correct** [12] - 13:15, 17:11, 18:4, 18:5, 45:19, 47:22, 49:7, 52:17, 65:24, 70:9, 78:4, 79:12

**corrections** [1] - 78:3

**Counsel** [2] - 2:6, 22:16, 33:10

**counsel** [3] - 4:1, 10:16, 79:13

**COUNTY** [1] - 79:2

**County** [2] - 2:6, 8:25

**county** [2] - 12:13, 74:10

**couple** [4] - 40:7, 40:15, 72:25, 74:9

**course** [5] - 22:7, 26:6, 59:1, 62:9, 64:3

**courses** [1] - 5:19

**court** [7] - 7:24, 8:1, 8:7, 8:8, 13:14, 13:19

**COURT** [1] - 1:1

**cover** [2] - 10:3, 77:13

**covers** [2] - 5:20, 14:5

**credence** [1] - 50:9

**credibility** [1] - 9:8

**crime** [2] - 39:21, 40:17

**criminal** [2] - 8:11, 8:13

**cross** [1] - 16:5

**cross-examine** [1] - 16:5

**crying** [1] - 38:9

**CSR** [3] - 1:16, 79:3, 79:23

**cues** [1] - 41:13

**cul** [1] - 70:23

**cul-de-sac** [1] - 70:23

**cured** [2] - 70:4, 70:5

**curriculum** [1] - 10:4

**cut** [1] - 11:21

**CV03-476** [1] - 1:3

### D

**danger** [1] - 22:24

**darken** [1] - 46:25

**darkened** [1] - 36:2

**darker** [1] - 47:16

**Darren** [1] - 19:7

**data** [1] - 22:7

**Date** [1] - 79:21

**date** [6] - 17:16, 21:17, 21:20, 39:16, 72:19, 73:4

**Dated** [1] - 78:5

**dated** [1] - 17:8

**daughter** [2] - 38:1, 38:5

**daughter-in-law** [1] - 38:5

**daughter-in-law's** [1] - 38:1

**Davenport** [3] - 2:9, 18:9, 18:21

**Davenport's** [1] - 19:21

**daylights** [1] - 76:8

**days** [2] - 62:22, 63:3

**de** [1] - 70:23

**deal** [3] - 11:20, 28:16, 31:13

**dealing** [1] - 21:11

**deals** [4] - 24:1, 24:3, 24:8, 26:8

**decided** [1] - 11:20

**decision** [2] - 28:2, 46:8

**deeply** [2] - 28:22, 61:11

**defendant** [3] - 8:16, 19:2, 19:4

**Defendants** [4] - 1:8, 1:11, 2:5, 4:4

**defendants** [2] - 10:7, 10:13

**defense** [6] - 8:18, 12:7, 12:19, 45:18, 45:21, 46:2

**degree** [7] - 4:19, 5:2, 41:17, 43:8, 59:1, 61:22, 76:2

**degrees** [1] - 5:1

**demeanor** [1] - 17:24, 31:5, 57:7

**Department** [1] - 8:8

**depo** [2] - 15:8, 60:12

**deponent** [3] - 79:8, 79:13, 79:17

**depos** [1] - 50:19

**DEPOSITION** [1] - 1:10

**deposition** [19] - 15:11, 15:22, 22:13, 23:6, 28:11, 39:18, 40:7, 40:14, 40:16, 46:2, 46:13, 52:13, 77:20, 79:7, 79:9, 79:12, 79:15, 79:16, 79:18

**depositions** [6] - 13:14, 19:6, 21:7, 49:14, 49:18, 53:6

**depressed** [4] - 23:17, 24:14, 24:23, 25:9

**depression** [3] - 5:25, 7:9, 9:5

**depressive** [3] - 7:12, 24:22, 26:4

**Deputies** [1] - 2:6

**describe** [2] - 25:25, 36:23

**Described** [1] - 28:8

**described** [8] - 19:22, 20:6, 23:8, 27:20, 34:17, 34:24, 40:20, 42:11

**describing** [2] - 31:5, 55:24

**description** [3] - 20:21, 23:7, 50:16

**desire** [1] - 21:2

**detail** [2] - 7:3, 58:25

**determination** [2] - 55:14, 68:11

**determine** [1] - 16:19

**Detrich** [1] - 19:8

**develop** [1] - 6:14

**developed** [1] - 75:10

**developing** [1] - 57:16

**developments** [1] - 50:23

**diabetes** [1] - 26:19

**diagnoses** [1] - 26:1

**diagnosis** [6] - 23:14, 23:16, 23:18, 23:20, 23:22, 41:20

**diagnostic** [2] - 7:13, 24:1

**Diazepam** [4] - 62:1, 62:6, 62:8, 62:15

**dictate** [1] - 45:2

**dictated** [1] - 46:4

**difference** [1] - 42:13

**different** [5] - 40:8, 70:11, 74:13, 74:25, 75:1

**differentiate** [1] - 59:6

**difficult** [1] - 61:18

**difficulties** [1] - 20:16

**difficulty** [5] - 25:1, 35:6, 65:12, 68:23, 69:5

**dimension** [1] - 24:25

**diminish** [2] - 48:19, 49:3

**diminishing** [1] - 48:24

**Dina** [1] - 2:9

**dinner** [1] - 35:25

**dire** [3] - 11:3, 15:13, 16:3

**Dire** [1] - 3:8

**DIRE** [1] - 11:5

**direct** [2] - 15:14, 65:25

**directive** [3] - 62:21, 62:22, 62:23

**Disability** [1] - 8:23

**disability** [2] - 6:4, 20:1

**discard** [1] - 45:12

**disclosure** [1] - 4:1

**discounting** [1] - 33:13

**discovery** [1] - 15:22

**discuss** [3] - 29:13, 29:15

**discussed** [2] - 10:2, 27:25

**Discussion** [1] - 15:25

**disease** [1] - 26:19

**disorder** [45] - 7:10, 7:11, 7:12, 9:5, 16:20, 23:17, 23:21, 23:24, 24:14, 24:15, 25:8, 25:14, 25:17, 25:18, 25:24, 26:4, 26:5, 26:11, 26:17, 27:1, 27:6, 28:21, 30:13, 31:2, 34:6, 35:11, 56:10, 56:16, 56:21, 59:8, 59:12, 59:17, 68:2, 68:16, 69:1, 69:20, 69:22, 70:3, 70:4, 70:5, 75:21, 75:22, 77:10

**disorders** [6] - 5:24, 9:6, 10:1, 23:21, 26:8, 77:11

**disorganized** [1] - 45:3

**disparity** [1] - 46:18

**dissatisfaction** [1] - 26:22

**dissatisfied** [1] - 26:13
**distance** [1] - 58:13
**distress** [8] - 25:10, 25:11, 25:12, 34:18, 34:20, 58:19, 59:15, 59:16
**distressed** [4] - 20:23, 25:14, 30:14, 40:23
**distressing** [1] - 23:10
**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 8:7
**disturbance** [1] - 59:7
**disturbances** [2] - 10:3, 76:1
**disturbed** [1] - 76:21
**disturbing** [1] - 31:15
**dives** [1] - 77:12
**division** [1] - 23:25
**divorce** [2] - 6:20, 24:17
**Doc** [1] - 22:18
**Doctor** [33] - 4:10, 5:2, 11:7, 12:15, 13:10, 16:4, 16:11, 18:13, 18:18, 29:10, 32:7, 34:5, 37:3, 38:24, 40:21, 43:12, 43:15, 45:8, 46:5, 57:11, 60:3, 61:7, 67:2, 70:1, 70:13, 70:18, 74:20, 76:6, 77:17
**doctor** [9] - 22:12, 46:9, 60:25, 61:1, 61:3, 62:20, 63:17, 65:25, 68:14
**doctor's** [3] - 63:20, 66:5, 67:21
**doctors** [3] - 12:16, 74:25, 75:14
**document** [3] - 17:11, 66:24, 67:23
**documents** [13] - 19:5, 21:9, 21:16, 22:2, 48:16, 48:20, 49:5, 49:8, 49:9, 49:11, 54:20, 60:10, 67:24
**DOES** [1] - 1:7
**Donald** [1] - 19:7
**done** [5] - 12:3, 12:17, 27:16, 53:19, 77:18

**door** [13] - 36:3, 36:6, 43:25, 44:1, 51:24, 71:22, 71:24, 72:6, 72:14, 76:7, 76:25, 77:1
**doubt** [2] - 56:9, 56:12
**down** [7] - 10:11, 11:15, 11:17, 11:21, 38:14, 60:15, 77:6
**dozen** [1] - 11:12
**Dr** [23] - 18:21, 18:22, 19:21, 20:14, 27:22, 34:23, 35:14, 38:22, 47:2, 47:9, 47:12, 47:16, 47:20, 47:23, 48:8, 48:11, 58:5, 60:4, 60:22, 61:14, 68:15, 75:11
**draft** [3] - 45:3, 45:4, 45:10
**drafts** [2] - 45:8, 45:11
**dramatic** [1] - 6:15
**draw** [6] - 50:2, 55:5, 60:15, 68:22, 71:21, 75:19
**drawing** [4] - 47:20, 51:12, 51:24, 57:16
**drew** [2] - 50:4, 71:15
**drive** [2] - 70:23, 70:24
**drop** [1] - 11:23
**drug** [7] - 24:6, 24:19, 27:4, 28:24, 30:10, 61:17, 62:4
**drugs** [3] - 27:19, 37:1, 62:1
**due** [1] - 27:6
**duly** [2] - 4:5, 79:8
**duration** [1] - 16:20
**during** [6] - 28:17, 31:21, 34:17, 44:2, 57:2, 57:25
**duty** [1] - 46:12

**E**

**early** [2] - 27:15, 34:17
**earn** [1] - 5:1
**eat** [1] - 59:3
**eating** [2] - 38:16, 56:5
**edits** [1] - 46:21
**educational** [1] - 4:18
**effect** [5] - 30:22, 51:17, 51:25, 59:7, 72:1

**effective** [1] - 56:7
**eighteen** [1] - 73:15
**Einstein** [1] - 4:21
**either** [5] - 7:9, 21:24, 25:19, 36:9, 79:15
**element** [1] - 56:18
**Eliashof** [1] - 4:12
**ELIASHOF** [5] - 1:10, 4:3, 78:1, 78:9, 79:6
**embarrassed** [9] - 28:22, 29:8, 29:11, 29:17, 29:24, 30:8, 30:21, 30:22, 61:11
**embarrassment** [2] - 28:25, 29:11
**emotion** [1] - 42:22
**emotional** [15] - 10:3, 25:10, 27:9, 34:18, 34:20, 40:19, 41:9, 42:3, 42:14, 59:7, 68:9, 74:7, 74:8, 75:7
**Emotional** [1] - 25:11
**emotionally** [5] - 20:23, 25:14, 40:23, 59:15, 77:9
**emphasis** [5] - 28:17, 42:3, 47:19, 51:24, 52:2
**emphasizing** [1] - 5:5
**employee** [2] - 20:7, 36:21
**encounter** [1] - 24:11
**encountered** [1] - 22:7
**end** [8] - 20:25, 46:8, 47:24, 48:3, 48:6, 65:8, 66:18, 77:20
**enemy** [1] - 72:1
**energy** [2] - 24:24, 34:16
**Engagement** [1] - 15:18
**enjoying** [1] - 11:20
**enter** [4] - 22:22, 36:11, 36:22, 50:7
**entered** [3] - 32:17, 36:9, 38:19
**entering** [2] - 40:9, 51:4
**entire** [3] - 15:6, 15:16, 53:6
**entirely** [1] - 11:21
**entries** [2] - 21:1, 44:23

**entry** [2] - 60:18, 67:14
**environmental** [1] - 24:4
**episode** [2] - 62:5, 64:5
**ESQ** [3] - 2:2, 2:5, 2:5
**establish** [1] - 46:13
**estimate** [3] - 7:21, 10:20, 11:1
**evaluate** [1] - 74:1
**evaluating** [3] - 54:16, 73:23, 75:14
**Evaluating** [1] - 8:23
**evaluation** [2] - 9:7, 46:15
**evaluations** [1] - 11:23
**event** [4] - 24:16, 25:7, 62:17, 76:4
**events** [2] - 73:11, 73:12
**evoke** [1] - 77:10
**evoked** [1] - 59:19
**exact** [1] - 30:19
**exactly** [1] - 14:19
**exam** [1] - 72:19
**EXAMINATION** [4] - 3:4, 4:8, 11:5, 43:13
**examination** [14] - 15:14, 16:14, 17:20, 17:22, 17:24, 23:15, 41:8, 41:23, 42:6, 42:9, 45:15, 45:18, 46:1, 49:19
**examinations** [1] - 5:4
**examine** [4] - 16:5, 17:16, 48:15, 74:11
**examined** [9] - 4:5, 17:14, 17:18, 41:21, 45:22, 49:4, 73:8, 74:10, 79:8
**examining** [2] - 41:15, 41:18
**example** [4] - 6:9, 26:4, 26:16, 47:1
**except** [2] - 18:21, 51:6
**Excessive** [1] - 25:4
**excessively** [1] - 65:14
**Exhibit** [4] - 3:16, 3:17, 17:6, 60:12
**Exhibits** [1] - 77:21
**EXHIBITS** [1] - 3:15
**exigency** [1] - 52:20
**expect** [1] - 20:2
**expeditious** [1] -

16:8
**experience** [1] - 55:2
**experienced** [1] - 34:1
**experiences** [1] - 58:19
**expert** [4] - 7:16, 7:20, 7:22, 8:1
**Expires** [1] - 79:24
**explain** [1] - 6:5
**explanation** [2] - 61:3, 61:9
**express** [1] - 26:12
**expression** [2] - 27:10, 41:12
**extent** [2] - 61:14, 75:25
**external** [2] - 24:16, 24:22
**extremely** [3] - 27:17, 29:5, 37:20

**F**

**facial** [2] - 27:10, 41:12
**facilitate** [1] - 38:3
**fact** [18] - 22:5, 28:14, 30:20, 31:7, 43:23, 46:4, 46:7, 50:4, 50:5, 50:6, 50:10, 55:1, 55:20, 57:17, 61:23, 68:4, 71:22, 72:13
**factors** [2] - 46:10, 46:13
**facts** [1] - 52:16
**failed** [1] - 79:17
**fair** [8] - 35:10, 48:14, 50:9, 54:24, 62:14, 69:12
**fairly** [1] - 24:10
**fall** [1] - 56:20
**false** [1] - 59:18
**familiarize** [1] - 18:3
**family** [5] - 27:13, 28:1, 28:19, 38:22, 65:17
**far** [8] - 12:17, 55:5, 55:6, 57:16, 64:9, 66:11, 72:12, 73:13
**favorite** [1] - 36:1
**February** [2] - 1:13, 79:5
**federal** [1] - 8:8
**Federal** [1] - 1:13
**fee** [1] - 13:24
**feelings** [1] - 61:13
**felt** [11] - 20:4, 30:21, 30:23, 31:10, 32:8,

32:13, 32:21, 33:13, 35:4, 38:10, 42:12
**few** [4] - 8:13, 11:9, 12:13, 71:4
**fewer** [2] - 11:22
**field** [2] - 7:17, 8:2
**fields** [1] - 14:10
**file** [7] - 15:5, 15:6, 15:10, 15:16, 21:1, 28:2, 42:6
**filed** [3] - 18:11, 79:15, 79:18
**financial** [1] - 46:10
**Fine** [1] - 46:17
**finish** [1] - 38:12
**finished** [1] - 21:3
**First** [1] - 70:16
**first** [22] - 4:5, 5:10, 14:21, 14:23, 18:24, 18:25, 19:3, 19:4, 20:17, 31:15, 36:11, 39:15, 43:17, 43:19, 43:20, 45:3, 59:2, 62:14, 73:21, 77:3, 77:4
**fishing** [1] - 37:10
**five** [2] - 10:20, 73:22
**focus** [3] - 6:2, 9:6, 40:18
**focuses** [1] - 7:4
**focusing** [1] - 51:21
**followed** [1] - 14:24
**Following** [1] - 4:23
**follows** [2] - 4:6, 75:2
**FOR** [1] - 1:2, 3:15
**foregoing** [1] - 79:11
**foremost** [1] - 31:15
**forensic** [13] - 6:2, 6:5, 6:23, 7:18, 7:20, 8:2, 9:6, 9:19, 9:22, 10:6, 11:23, 14:9, 75:8
**forget** [1] - 21:21
**forgetting** [1] - 26:12
**forgot** [1] - 52:19
**forgotten** [1] - 30:18
**form** [3] - 28:20, 32:25, 63:5
**format** [2] - 47:21, 70:3
**formed** [2] - 30:12, 50:18
**forming** [4] - 43:6, 50:15, 50:24, 57:1
**foundation** [4] - 21:12, 21:19, 62:12, 64:7
**four** [8] - 12:19, 40:6, 43:19, 44:12, 46:19,

60:16, 73:22
**fourth** [1] - 19:1
**free** [1] - 24:11
**freshness** [1] - 58:14
**frightened** [4] - 27:17, 32:10, 38:6, 77:4
**front** [1] - 44:22
**full** [2] - 60:10, 67:23
**function** [1] - 25:21
**functioning** [4] - 24:9, 26:24, 34:12, 35:7
**functions** [1] - 20:2

## G

**GAVIGAN** [2] - 2:5, 16:9
**general** [10] - 5:22, 14:6, 14:11, 19:12, 19:18, 24:9, 26:23, 29:18, 29:25, 30:3
**given** [13] - 11:25, 13:4, 20:2, 38:1, 43:8, 48:17, 49:5, 53:6, 62:1, 62:3, 62:8, 67:24, 69:9
**Given** [1] - 56:1
**glass** [1] - 37:24
**graduated** [4] - 4:20, 4:22
**great** [5] - 11:20, 28:16, 31:13, 41:13, 55:12
**greater** [1] - 61:14
**grit** [3] - 55:6, 55:16, 68:10
**Group** [1] - 18:9
**groups** [2] - 5:20, 54:8
**guess** [5] - 18:20, 29:10, 56:22, 61:1, 63:10
**gun** [1] - 6:16
**guy** [2] - 21:21, 47:5

## H

**Halekauwila** [1] - 2:2
**half** [6] - 16:16, 36:4, 57:21, 57:25, 58:3, 58:16
**hand** [1] - 51:1
**handed** [1] - 32:21
**handing** [1] - 17:5
**hard** [5] - 20:6, 42:13, 54:24, 54:25, 56:6
**hardly** [1] - 76:25

**Harvard** [1] - 4:24
**Haven** [1] - 4:23
**HAWAII** [2] - 1:2, 79:1
**Hawaii** [17] - 1:12, 1:16, 1:20, 2:3, 2:7, 4:13, 5:9, 5:11, 5:15, 7:23, 8:21, 8:24, 17:12, 79:4, 79:19, 79:24
**head** [2] - 57:14, 69:25
**headache** [1] - 63:19
**headaches** [1] - 63:24
**headed** [1] - 38:13
**heal** [1] - 20:1
**health** [3] - 35:18, 41:9, 75:18
**hear** [2] - 36:4, 44:2
**heard** [3] - 23:3, 36:3, 53:23
**hearing** [3] - 25:15, 40:25, 70:8
**hears** [2] - 72:9, 77:11
**hearsay** [1] - 21:13
**heart** [1] - 26:19
**height** [1] - 34:18
**held** [2] - 6:16, 15:25
**Help** [1] - 50:22
**help** [5] - 35:15, 53:3, 57:11, 63:12, 63:13
**helpful** [1] - 20:8
**hereby** [2] - 78:1, 79:4
**herein** [1] - 79:7
**herself** [5] - 20:11, 40:15, 58:13, 65:13, 65:15
**high** [4] - 20:11, 24:10, 32:21, 65:15
**highlight** [1] - 53:4
**highlighted** [4] - 51:11, 51:16, 52:12, 52:13
**highly** [1] - 30:7
**hired** [3] - 45:18, 73:20, 73:25
**hiring** [1] - 46:4
**history** [6] - 4:20, 17:23, 18:3, 52:11, 57:16, 69:5
**hit** [1] - 40:2
**hold** [2] - 5:7, 8:20
**home** [21] - 29:14, 35:5, 35:21, 35:24, 36:9, 36:18, 36:22, 37:14, 37:16, 37:19,

38:8, 39:4, 40:5, 40:11, 43:18, 55:20, 55:23, 56:14, 67:17, 67:18, 72:5
**honest** [1] - 46:14
**HONOLULU** [1] - 79:2
**Honolulu** [8] - 1:12, 1:20, 2:3, 2:6, 2:7, 4:13, 4:14, 8:25
**Honor** [1] - 43:11
**hoped** [2] - 33:24, 33:25
**hospital** [1] - 38:10
**hospitalization** [2] - 55:3, 55:19
**hour** [4] - 13:13, 13:16, 13:20, 55:11
**hours** [5] - 16:16, 57:21, 57:25, 73:14, 73:15
**house** [16] - 22:20, 25:6, 27:24, 30:9, 30:21, 30:23, 32:17, 32:20, 36:13, 38:18, 38:21, 39:7, 43:24, 44:7, 52:24, 56:17
**HTN** [2] - 63:19, 63:24
**humiliated** [2] - 42:12, 61:11
**hunch** [1] - 77:2
**hurt** [1] - 57:17
**husband** [10] - 23:8, 28:12, 29:14, 31:7, 34:11, 34:13, 35:24, 38:8, 38:9, 55:19
**Hypertension** [1] - 64:1
**hypertension** [7] - 64:3, 64:9, 64:15, 64:18, 64:22, 65:2, 65:20
**hypertensive** [2] - 64:24, 64:25

## I

**idea** [6] - 28:3, 49:17, 60:2, 60:3, 67:5, 69:19
**ideals** [1] - 20:11
**identification** [1] - 77:21
**IDENTIFICATION** [1] - 3:15
**identified** [3] - 49:9, 54:21, 66:20
**Idol** [1] - 36:2
**II** [3] - 23:20, 26:1,

26:8
**III** [3] - 23:25, 26:1, 26:18
**ill** [1] - 25:15
**illegal** [1] - 43:18
**illness** [9] - 16:19, 19:24, 24:15, 26:3, 26:19, 35:16, 52:12, 59:20, 75:8
**IME** [3] - 14:17, 48:12, 48:15
**IME's** [9] - 12:3, 12:6, 12:7, 12:8, 13:2, 13:6, 13:7, 13:16
**immediate** [1] - 58:6
**immediately** [1] - 43:24
**impairment** [1] - 25:19
**impairments** [1] - 6:3
**imply** [1] - 25:12
**implying** [1] - 46:3
**importance** [3] - 31:2, 41:18, 42:8
**important** [8] - 20:4, 20:15, 23:6, 41:7, 41:10, 49:21, 73:5, 73:9
**impression** [1] - 59:18
**improper** [1] - 33:5
**improperly** [1] - 26:13
**IN** [1] - 1:1
**in-person** [1] - 43:2
**inaccuracy** [1] - 50:25
**incensed** [1] - 37:21
**incident** [27] - 6:11, 20:20, 21:1, 21:17, 23:11, 29:8, 29:12, 31:17, 31:22, 32:8, 33:21, 47:13, 53:21, 54:20, 55:18, 56:11, 58:1, 58:14, 64:13, 64:14, 65:12, 68:17, 69:3, 72:22, 76:10, 76:16
**included** [1] - 17:22, 18:7, 49:11
**includes** [1] - 56:13
**including** [1] - 48:21
**inclusive** [1] - 78:2
**inconsistencies** [11] - 22:6, 23:12, 39:11, 39:14, 39:15, 40:22, 41:3, 45:6, 51:1, 53:1, 53:2
**inconsistency** [3] -

39:18, 39:24, 44:9
**inconsistent** [1] -
45:7
**increasingly** [2] -
31:17, 32:23
**independent** [2] -
45:14, 45:17
**indicate** [3] - 47:24,
48:2, 48:8
**indicated** [3] - 20:15,
48:1, 48:16
**indicates** [1] - 24:10
**indicating** [1] - 30:6
**indication** [2] -
23:23, 58:11
**indications** [1] -
23:23
**individual** [6] -
20:10, 20:17, 30:3,
65:18, 68:10, 68:13
**inflections** [1] -
41:12
**influence** [1] - 13:12
**information** [8] -
17:25, 21:24, 23:10,
41:11, 42:1, 42:3,
42:4, 42:17
**informed** [2] - 40:24,
42:16
**inherent** [1] - 22:24
**injuries** [3] - 19:22,
74:4, 74:6
**injury** [8] - 6:3, 6:10,
6:13, 6:15, 19:23,
20:3, 74:7
**inquiring** [1] - 32:12
**insomnia** [1] - 69:17
**instance** [3] - 6:19,
26:10, 58:20
**instances** [1] - 6:12
**instead** [2] - 61:14,
61:16
**integrity** [1] - 20:10
**intensity** [3] - 31:4,
40:20, 59:6
**intent** [1] - 47:17
**intentionally** [1] -
52:15
**interest** [4] - 5:21,
5:23, 6:1, 7:6
**interfere** [1] - 34:12
**interfered** [1] - 25:23
**internally** [1] - 25:21
**internship** [1] - 4:22
**interpret** [1] - 67:19
**interpretations** [1] -
75:16
**interpreted** [1] -
67:10
**interpreting** [1] -

75:12, 75:14
**interrogatories** [1] -
19:3
**intersect** [2] - 6:8,
6:19
**interview** [24] -
28:11, 28:17, 31:21,
33:23, 35:19, 39:7,
40:14, 40:18, 42:23,
43:1, 43:3, 44:2, 52:9,
54:17, 57:2, 57:11,
57:12, 57:16, 57:20,
57:22, 58:21, 58:24,
59:19, 77:16
**interviewed** [1] -
44:24
**interviewing** [1] -
13:17
**Inventory** [1] - 75:3
**invite** [1] - 40:10
**invited** [8] - 23:4,
40:8, 40:13, 51:22,
51:25, 52:3, 52:25,
53:16
**involved** [5] - 27:19,
48:22, 74:11, 74:12,
74:17
**involvement** [1] -
36:25
**involving** [1] - 53:19
**issue** [6] - 28:16,
31:15, 48:23, 49:21,
57:8, 72:16
**issued** [1] - 28:7
**issues** [6] - 6:21, 9:7,
9:8, 24:2, 33:7
**Issues** [1] - 6:21
**IV** [3] - 24:3, 26:2,
26:20


## J

**JACK** [1] - 2:2
**JEFFREY** [1] - 1:6
**job** [4] - 24:17, 56:7,
74:5, 74:9
**jobs** [1] - 55:11
**Journal** [3] - 9:13,
9:15, 9:21
**journal** [1] - 44:23
**journals** [1] - 9:10
**judges** [2] - 7:16,
7:22
**judgment** [1] - 25:22
**July** [7] - 17:8, 17:15,
17:18, 68:19, 69:16,
72:19, 72:20
**juncture** [1] - 22:4
**June** [3] - 32:8,
60:18, 62:8, 63:7,

64:17, 65:22, 66:12,
66:15, 66:23, 67:1,
67:6, 67:7, 67:10,
67:19, 76:17
**juror's** [1] - 46:10
**jury** [2] - 46:8, 46:14


## K

**Kalihi** [1] - 73:1
**Kamakani** [1] - 19:8
**KAWAI** [36] - 2:5,
4:9, 11:2, 15:12,
15:19, 15:22, 16:10,
17:10, 18:17, 19:13,
19:19, 21:14, 22:1,
23:13, 29:23, 31:20,
31:25, 32:6, 33:6,
33:11, 33:18, 39:1,
43:11, 54:2, 54:6,
55:7, 55:25, 60:13,
61:5, 62:12, 64:6,
66:24, 67:3, 69:10,
76:11, 76:18
**Kawai** [1] - 3:5
**Kawai's** [1] - 14:20
**keep** [3] - 22:17,
45:13, 56:3
**keeping** [1] - 71:20
**Ken** [1] - 18:9
**KENDRA** [1] - 2:5
**Kind** [1] - 48:19
**kind** [23] - 12:25,
13:22, 25:21, 26:9,
30:2, 40:9, 45:17,
47:9, 48:23, 54:13,
55:6, 57:15, 59:16,
68:1, 68:5, 72:8,
72:10, 72:11, 72:13,
76:1, 77:9
**kinds** [6] - 6:21,
7:12, 9:8, 13:19, 54:8,
75:7
**King** [1] - 2:7
**knocks** [1] - 51:24
**knowing** [3] - 42:20,
68:4, 76:1
**KSC** [1] - 1:3


## L

**labeled** [1] - 31:1
**Labor** [1] - 8:8
**lack** [3] - 21:11,
21:19, 34:16
**Lacks** [2] - 62:12,
64:7
**lady** [5] - 54:23,
54:24, 54:25, 55:6,
64:25
**language** [3] - 27:10,

41:13, 42:4
**large** [2] - 57:3,
57:17
**last** [2] - 12:19, 16:15
**lasted** [4] - 34:21,
57:20, 71:1, 71:11
**law** [4] - 6:7, 6:18,
37:11, 38:5
**Law** [3] - 8:23, 9:15,
9:21
**law's** [1] - 38:1
**lawsuit** [2] - 21:8,
28:2
**lawyers** [1] - 12:10
**lay** [1] - 25:11
**Leading** [2] - 31:19,
32:2
**leading** [1] - 29:21
**learned** [1] - 29:19
**learning** [1] - 27:2
**least** [2] - 66:8, 67:17
**left** [8] - 29:3, 32:16,
37:18, 37:24, 37:25,
40:2, 51:6, 63:18
**legal** [2] - 33:25,
49:12
**less** [4] - 13:24, 30:9,
31:2, 61:15
**letter** [5] - 14:21,
14:24, 14:25, 15:17,
15:18
**letting** [1] - 60:6
**level** [4] - 25:13,
25:16, 26:23, 41:14
**Liberty** [2] - 18:9,
18:21
**license** [4] - 5:8,
5:10, 5:12, 5:13
**licenses** [1] - 5:7
**life** [4] - 20:19, 24:17,
26:11, 62:5
**lifelong** [2] - 23:20,
26:9
**light** [3] - 22:18,
38:13, 65:14
**light-headed** [1] -
38:13
**likely** [1] - 50:16
**LIPTON** [3] - 1:16,
79:3, 79:23
**list** [5] - 12:16, 49:11,
56:15, 56:24, 57:4
**listed** [2] - 10:4, 31:3
**live** [2] - 57:15, 57:22
**lived** [1] - 26:7
**living** [1] - 76:8
**logical** [1] - 47:8
**Look** [1] - 70:13
**look** [13] - 10:5, 15:3,
15:9, 48:16, 48:17,

49:5, 60:9, 60:21,
71:12, 74:21, 74:25,
75:15, 75:25
**looked** [9] - 18:14,
49:4, 49:5, 49:8,
54:23, 60:4, 60:21,
60:22, 77:2
**looking** [13] - 15:5,
34:23, 36:16, 39:3,
42:16, 48:6, 49:23,
49:25, 53:17, 60:20,
67:1, 67:2, 70:21
**looks** [8] - 51:16,
51:21, 51:23, 60:16,
66:6, 66:9, 66:15,
67:18
**lose** [1] - 38:23
**losing** [1] - 24:17
**loss** [1] - 24:24
**loud** [6] - 36:3, 36:4,
71:23, 71:25, 72:5,
75:24
**loyal** [1] - 20:7
**Lum** [16] - 18:10,
20:14, 27:22, 34:23,
35:15, 38:22, 47:2,
47:9, 47:13, 47:20,
47:23, 48:11, 58:5,
60:22, 61:14, 68:15
**Lum's** [5] - 18:22,
47:2, 47:16, 48:8,
60:4


## M

**M.C** [1] - 18:9
**M.D** [8] - 1:10, 4:3,
5:2, 18:9, 18:10, 78:1,
78:9, 79:6
**machine** [1] - 79:9
**magazines** [1] - 9:10
**magnification** [1] -
19:25
**mail** [1] - 79:14
**major** [3] - 26:4,
40:18, 77:6
**majoring** [1] - 4:20
**malpractice** [1] -
6:22
**man** [1] - 75:11
**manic** [1] - 7:11
**manifest** [1] - 24:25
**manner** [4] - 27:8,
31:4, 31:14, 57:5
**MANUELE** [1] - 2:5
**margin** [1] - 63:18
**MARIE** [1] - 2:5
**marital** [1] - 26:22
**mark** [2] - 60:9,
60:12

marked [3] - 11:23, 17:5, 77:21
MARKED [1] - 3:15
match [1] - 49:25
matter [1] - 55:20
matters [4] - 8:11, 8:12, 8:13, 8:15
mean [9] - 25:16, 34:3, 40:20, 43:11, 45:14, 49:2, 51:22, 58:23, 59:2
Meaning [2] - 53:15, 53:16
meant [2] - 36:18, 69:13
Medical [6] - 4:23, 4:24, 8:21, 8:24, 8:25, 18:8
medical [24] - 5:16, 18:3, 18:6, 18:7, 18:14, 18:19, 19:15, 20:12, 21:4, 21:6, 21:11, 24:1, 24:2, 26:18, 42:1, 43:8, 45:15, 47:2, 47:6, 48:23, 49:19, 51:15, 61:22, 76:3
medication [3] - 35:15, 62:18, 64:24
medications [1] - 27:22
Medicine [2] - 4:21, 5:2
medicine [1] - 5:8
melodious [1] - 22:16
membership [1] - 8:20
memory [3] - 41:5, 59:20, 74:18
mental [6] - 10:3, 17:23, 23:21, 35:18, 41:9, 75:18
mention [9] - 35:8, 40:13, 61:2, 61:9, 63:13, 63:15, 69:17, 70:7, 70:10
mentioned [5] - 7:1, 16:23, 18:2, 34:19, 73:17
mentioning [1] - 31:8
method [2] - 75:2, 75:17
middle [1] - 76:25
might [26] - 7:11, 20:2, 20:18, 22:4, 24:6, 24:17, 24:18, 24:23, 25:14, 27:23, 28:15, 28:18, 29:18,

39:23, 46:11, 46:20, 55:6, 62:9, 68:5, 70:14, 70:24, 71:7, 71:12, 76:22, 77:6
mile [1] - 36:4
military [1] - 54:13
mind [11] - 15:8, 31:13, 38:15, 46:11, 53:3, 56:3, 56:9, 71:20, 72:4, 72:16, 73:5
minimal [1] - 34:10
Minnesota [2] - 75:3, 75:10
minor [2] - 19:23, 56:18
minute [1] - 37:3
minutes [1] - 73:15
misleading [1] - 41:4
misnomer [1] - 45:17
misrepresenting [1] - 52:15
missed [2] - 59:5, 66:10
Misstates [1] - 66:24
mistake [2] - 17:18, 21:20
mistakes [2] - 21:24, 52:23
mixed [2] - 23:17, 24:14, 25:8
MMPI [4] - 65:14, 74:23, 75:3, 75:13
MMPI's [2] - 74:25, 75:14
moment [1] - 70:23
money [3] - 13:11, 13:22, 13:23
monies [1] - 45:25
month [3] - 13:6, 39:17, 71:2
months [7] - 64:12, 64:13, 71:1, 71:4, 71:11, 73:1
mood [3] - 23:17, 24:14, 24:23, 25:9
morning [1] - 55:3
most [10] - 6:17, 23:10, 25:3, 42:18, 64:17, 68:7, 73:5, 73:9, 75:5, 75:17
moved [1] - 7:7
MR [39] - 11:4, 11:6, 15:15, 15:18, 15:21, 16:2, 16:7, 17:7, 18:12, 19:11, 19:17, 21:10, 21:18, 22:11, 22:17, 29:20, 31:19, 31:23, 32:2, 33:3, 33:8, 33:12, 37:2,

38:23, 43:14, 54:4, 54:15, 55:8, 56:8, 60:14, 61:6, 62:13, 64:11, 66:25, 67:4, 69:11, 74:20, 76:12, 77:17
MS [36] - 4:9, 11:2, 15:12, 15:19, 15:22, 16:9, 16:10, 17:10, 18:17, 19:13, 19:19, 21:14, 22:1, 23:13, 29:23, 31:20, 31:25, 32:6, 33:6, 33:11, 33:18, 39:1, 43:11, 54:2, 54:6, 55:7, 55:25, 60:13, 61:5, 62:12, 64:6, 66:24, 67:3, 69:10, 76:11, 76:18
Multiphasic [1] - 75:3
Mutual [2] - 18:9, 18:21

# N

name [4] - 4:11, 4:12, 12:10, 12:14
named [1] - 75:11
narrative [6] - 19:12, 19:18, 38:24, 38:25, 39:2, 39:4
nature [3] - 7:3, 16:20, 20:2
nearly [1] - 59:16
necessarily [2] - 25:12, 25:16
necessary [1] - 5:4
need [3] - 37:2, 38:10, 65:13
needed [4] - 35:17, 36:22, 55:18, 69:17
neighbor [2] - 59:21, 59:23
neighborhood [1] - 76:1
neighbors [15] - 27:14, 28:23, 29:4, 29:7, 29:11, 29:16, 31:10, 37:19, 37:22, 41:1, 42:12, 42:16, 42:20, 63:16, 65:17
Neil [4] - 19:8, 51:6, 51:9
NEIL [1] - 1:6
nervous [1] - 39:25
neurology [1] - 5:5
new [1] - 76:10
New [4] - 4:21, 4:23
next [9] - 38:11,

47:13, 55:3, 55:13, 60:9, 62:21, 63:7, 66:22, 68:8
night [13] - 29:14, 31:6, 55:1, 55:3, 69:17, 70:12, 70:13, 70:17, 71:14, 72:5, 72:9, 72:15, 76:25
nights [1] - 27:21
Nihei [1] - 19:7
NO [4] - 1:3, 1:16, 79:3, 79:23
noise [1] - 75:24
noises [10] - 70:8, 70:12, 70:13, 70:17, 70:20, 71:6, 71:14, 71:21, 72:9, 76:21
non [2] - 20:12, 21:6, 21:11
non-medical [3] - 20:12, 21:6, 21:11
normal [1] - 26:6
Notary [1] - 1:16, 79:3, 79:24
note [7] - 21:10, 33:3, 47:16, 67:7, 67:11, 67:21, 71:14
noted [3] - 23:9, 23:11, 78:3
notes [14] - 44:19, 44:23, 45:1, 47:2, 47:12, 60:7, 62:25, 63:20, 64:14, 65:1, 66:5, 67:16, 68:14, 74:21
nothing [3] - 27:17, 51:8, 77:13
notice [13] - 11:10, 15:5, 44:16, 45:5, 46:18, 47:23, 51:5, 60:17, 60:24, 62:7, 64:2, 65:21, 66:18
noticed [10] - 13:10, 13:12, 43:15, 44:18, 46:24, 47:15, 49:11, 51:21, 61:25
notified [1] - 79:13
number [11] - 21:23, 27:11, 30:6, 38:1, 41:13, 50:23, 52:24, 53:20, 56:20, 57:7, 71:2

# O

object [2] - 18:12, 19:11
Objection [12] - 29:20, 31:19, 54:2, 55:7, 55:25, 61:5,

62:12, 64:6, 66:24, 67:3, 69:10, 76:11
objection [9] - 19:17, 21:10, 21:19, 22:11, 31:23, 32:2, 33:3, 54:6, 76:18
obsessive [1] - 7:10
obstacles [1] - 41:23
obtain [1] - 5:10
obtained [1] - 5:12
occasions [1] - 73:18
occurred [14] - 6:11, 21:17, 23:7, 23:9, 38:18, 49:21, 50:17, 52:22, 52:23, 54:10, 54:11, 59:2, 59:9, 73:12
occurs [3] - 54:7, 54:14, 77:10
odds [1] - 50:3
OF [4] - 1:2, 1:10, 79:1, 79:2
Ofelia [1] - 19:6
OFELIA [1] - 1:3
offer [2] - 29:1, 30:16
office [2] - 10:16, 14:20
Officer [5] - 32:19, 36:15, 37:15, 38:20, 51:16
officer [6] - 27:18, 37:7, 51:5, 51:14, 74:1, 74:2
officers [17] - 22:14, 36:9, 36:15, 44:7, 48:22, 49:15, 49:18, 50:12, 50:19, 51:2, 52:24, 53:7, 53:19, 53:20, 54:13, 54:17, 73:18
officers' [3] - 49:23, 50:15, 54:16
old [1] - 63:22
OMAI [1] - 1:6
once [5] - 23:9, 32:11, 32:14, 34:8, 56:5
One [1] - 39:25
one [22] - 9:20, 20:2, 22:8, 30:18, 30:21, 36:15, 40:4, 44:10, 50:6, 51:14, 55:10, 56:15, 56:19, 61:21, 64:19, 64:20, 66:8, 66:18, 66:21, 67:17, 74:21
one's [2] - 25:19, 25:20
ongoing [1] - 58:23

HONOLULU REPORTING SERVICES

**open** [2] - 71:24, 72:6
**opened** [2] - 36:6, 71:22
**opening** [1] - 72:14
**opinion** [17] - 26:25, 29:1, 29:17, 29:24, 30:17, 30:24, 32:25, 43:6, 49:6, 50:15, 50:18, 50:24, 51:10, 52:3, 57:1, 66:6, 69:14
**opinions** [6] - 28:20, 30:12, 31:3, 43:7, 48:25, 49:3
**opportunity** [2] - 12:16, 16:5
**order** [3] - 25:18, 45:4, 60:10
**organizing** [1] - 25:1
**otherwise** [1] - 32:13
**outline** [1] - 63:22
**outside** [5] - 36:14, 70:8, 70:11, 71:21, 75:24
**over-simplifying** [1] - 50:21
**overcame** [1] - 35:10
**overdrawing** [1] - 72:10
**overlap** [1] - 6:9
**overstate** [1] - 51:23
**own** [6] - 28:3, 30:10, 48:22, 50:25, 66:5, 75:16

**P**

**p.m** [3] - 1:12, 76:25, 79:5
**Page** [3] - 3:3, 33:11, 51:19
**page** [16] - 27:15, 27:20, 29:2, 29:6, 33:6, 33:10, 33:16, 43:19, 43:20, 47:1, 48:1, 48:4, 48:5, 49:9, 51:18, 70:13
**pages** [3] - 60:16, 78:2
**paid** [2] - 45:25, 46:2
**pain** [2] - 6:1, 9:25
**Pang** [4] - 19:8, 51:6, 51:9
**PANG** [1] - 1:6
**paper** [2] - 36:17, 75:4
**paragraph** [8] - 43:17, 43:21, 48:3, 48:4, 48:5, 48:7,

70:15, 70:16
**parentheses** [1] - 48:7
**part** [12] - 6:24, 7:1, 9:11, 22:8, 34:18, 50:12, 50:14, 57:3, 57:17, 60:11, 63:22, 67:6
**particular** [8] - 5:17, 7:17, 42:8, 53:21, 54:20, 60:17, 62:5, 76:9
**Particularly** [1] - 56:2
**particularly** [1] - 20:4
**parties** [2] - 16:3, 79:17
**party** [1] - 16:24
**passed** [1] - 5:4
**passes** [1] - 77:16
**passing** [1] - 36:9
**passive** [1] - 26:10
**past** [5] - 34:8, 69:4, 69:7, 69:8, 76:23
**patient** [3] - 13:18, 45:19, 48:15
**patients** [11] - 5:24, 7:2, 7:8, 11:10, 11:11, 11:22, 12:1, 12:23, 13:4, 13:21, 13:24
**pattern** [2] - 26:15
**pause** [1] - 70:23
**payment** [1] - 46:10
**pediatrics** [1] - 4:23
**pencil** [1] - 75:4
**people** [12] - 29:18, 29:25, 30:4, 30:8, 41:14, 54:8, 54:9, 57:9, 58:7, 65:16, 68:5, 68:7
**per** [2] - 12:24, 13:12
**percent** [7] - 8:18, 8:19, 10:11, 10:14, 12:7, 12:8, 13:8
**percentage** [2] - 10:9, 12:7
**perform** [2] - 41:7, 41:22
**perhaps** [1] - 44:23
**period** [3] - 34:24, 59:13, 62:25
**periodicals** [2] - 9:11, 9:16
**permission** [3] - 37:14, 40:9, 50:8
**person** [12] - 25:23, 41:15, 41:16, 41:21, 41:23, 42:7, 43:2, 45:7, 56:3, 65:9, 68:6,

76:2
**person's** [3] - 24:16, 41:8, 41:11
**personality** [6] - 23:21, 23:24, 26:8, 26:11, 26:17, 72:12
**Personality** [1] - 75:3
**personnel** [4] - 18:7, 20:5, 48:22, 75:8
**pertains** [1] - 26:3
**phenomena** [1] - 54:14
**Philippines** [1] - 37:12
**phobic** [2] - 7:10, 9:6
**phone** [2] - 14:22, 38:1
**physical** [2] - 6:13, 74:7
**physician** [2] - 38:22, 47:4
**Physicians** [1] - 8:24
**pick** [2] - 45:6, 58:10
**picked** [5] - 46:21, 52:9, 54:23, 61:10, 73:10
**picking** [2] - 61:4, 65:1
**picture** [1] - 46:14
**Piikoi** [2] - 1:11, 4:13
**place** [3] - 8:6, 30:20, 38:16
**placed** [2] - 24:9, 50:9
**places** [1] - 70:7
**plaintiff** [19] - 8:16, 12:8, 16:14, 17:3, 17:21, 19:6, 23:15, 29:24, 31:16, 31:21, 32:7, 34:5, 35:8, 35:10, 35:19, 42:9, 42:22, 43:2, 43:3
**Plaintiff** [2] - 1:4, 2:2
**plaintiff's** [10] - 12:11, 12:17, 18:3, 19:2, 19:4, 27:1, 27:6, 30:13, 39:8, 39:11
**plaintiffs** [4] - 8:19, 9:7, 10:7, 10:10
**Plan** [1] - 66:2
**plan** [2] - 66:3, 66:20
**pleadings** [2] - 21:7, 49:12
**point** [21] - 27:20, 27:22, 27:25, 28:10, 30:18, 31:8, 33:12, 33:23, 39:25, 40:1, 40:4, 40:5, 45:5, 55:11, 55:16, 55:17,

59:12, 61:12, 61:25, 62:8, 73:20
**pointed** [1] - 46:20
**pointing** [1] - 48:5
**police** [56] - 22:13, 25:5, 30:8, 30:14, 30:23, 32:11, 35:20, 36:7, 36:10, 36:22, 37:13, 38:1, 38:6, 39:22, 40:1, 41:2, 41:6, 42:15, 42:16, 42:20, 42:24, 43:5, 43:19, 48:22, 49:14, 49:18, 49:23, 50:12, 50:14, 50:19, 51:5, 51:12, 52:24, 53:19, 53:20, 54:13, 54:16, 54:17, 55:2, 56:13, 56:16, 61:16, 63:15, 64:5, 71:23, 72:25, 73:1, 73:17, 74:1, 74:2, 74:11, 74:13, 74:17, 76:10, 77:3
**policeman** [1] - 36:12
**policemen** [7] - 29:3, 37:18, 40:5, 43:24, 43:25, 73:23
**policy** [1] - 41:20
**portion** [1] - 60:21
**portions** [2] - 53:9, 53:10
**portray** [1] - 54:10
**possibility** [1] - 52:22
**possible** [2] - 39:15, 50:24
**possibly** [3] - 24:6, 64:9, 69:2
**Possibly** [2] - 42:1, 69:2
**post** [1] - 77:11
**post-traumatic** [1] - 77:11
**pound** [1] - 76:7
**pounding** [3] - 71:23, 71:25, 72:14
**practice** [10] - 5:8, 5:11, 5:22, 6:25, 7:1, 7:3, 7:4, 11:22, 45:2, 45:12
**practicing** [1] - 11:20
**preexisting** [1] - 65:2
**preoccupation** [1] - 61:10
**preoccupied** [1] - 28:14
**prepare** [1] - 73:16
**preparing** [3] - 13:18, 48:25, 73:14

**prescribe** [1] - 62:18
**prescribed** [4] - 62:15, 64:21, 64:23, 65:22
**prescribing** [1] - 68:15
**prescription** [2] - 68:19, 69:13
**present** [10] - 5:23, 7:4, 11:13, 25:5, 36:14, 42:15, 52:11, 59:17, 65:13, 76:24
**presented** [5] - 4:1, 17:24, 21:25, 31:14, 41:24
**previous** [1] - 64:19
**primarily** [2] - 6:2, 28:14
**primary** [6] - 26:21, 26:25, 27:2, 27:6, 47:4, 57:8
**probability** [1] - 43:9
**problem** [3] - 24:5, 26:9, 47:9
**problems** [11] - 6:1, 6:14, 24:1, 24:4, 26:20, 34:9, 64:3, 65:10, 69:3, 69:4, 69:8
**Procedure** [2] - 1:14, 79:19
**proceeded** [1] - 37:13
**process** [1] - 45:23
**procrastinate** [1] - 26:12
**production** [1] - 19:5
**profession** [2] - 4:16, 9:12
**professional** [2] - 9:10, 35:18
**professionals** [1] - 75:18
**prognosis** [2] - 50:13, 50:14
**program** [1] - 36:1
**prolongation** [1] - 19:25
**prolonged** [2] - 19:24, 35:17
**prominent** [1] - 25:4
**proper** [1] - 22:25
**prospect** [1] - 58:21
**provided** [3] - 18:1, 21:24, 23:7
**psyche** [1] - 68:4
**Psychiatric** [2] - 8:21, 41:19
**psychiatric** [12] - 6:3, 6:10, 6:14, 6:22,

16:19, 25:13, 25:17,
26:3, 35:11, 35:13,
75:7

**psychiatrist** [5] -
4:17, 10:6, 41:7,
41:22, 41:24

**Psychiatry** [6] - 8:22,
9:13, 9:14, 9:15, 9:21

**psychiatry** [24] -
4:24, 5:5, 5:6, 5:18,
5:21, 5:22, 6:2, 6:5,
6:7, 6:18, 6:23, 7:18,
7:20, 8:2, 9:19, 9:23,
9:25, 14:1, 14:4, 14:6,
14:8, 14:9, 14:12

**psychological** [6] -
17:25, 30:5, 35:12,
35:14, 75:4, 75:6

**psychosocial** [1] -
24:3

**Public** [3] - 1:16,
79:3, 79:24

**publically** [1] - 41:20

**publications** [1] -
9:18

**purpose** [5] - 15:21,
38:25, 49:17, 51:23,
62:19

**purposes** [4] - 48:11,
49:6, 49:19, 54:16

**pursuant** [2] - 1:13,
79:18

**put** [13] - 34:2, 36:3,
37:17, 38:15, 45:4,
46:7, 56:24, 58:13,
67:20, 71:2, 71:16,
74:13, 76:6

**putting** [3] - 51:3,
52:2, 57:4

## Q

**qualified** [3] - 7:16,
7:19, 7:22

**qualify** [1] - 67:13

**quality** [1] - 58:9

**questioned** [1] -
32:19

**questioning** [1] -
33:14

**questions** [10] -
11:9, 13:11, 16:12,
18:19, 19:14, 32:11,
53:13, 57:13, 75:5,
75:15

**quick** [2] - 15:23,
74:21

**quit** [1] - 11:21

**quite** [5] - 27:9, 31:9,
40:19, 42:18, 67:9

## R

**ranked** [1] - 56:14
**rates** [3] - 13:11,
16:22, 16:23
**rather** [2] - 70:21,
72:17
**re** [2] - 59:19, 77:10
**re-evoke** [1] - 77:10
**re-evoked** [1] - 59:19
**reach** [1] - 25:13
**reaching** [1] - 72:12
**reaction** [2] - 23:8,
24:21
**reactive** [1] - 68:9
**read** [8] - 9:11, 9:13,
9:17, 9:18, 9:20,
62:22, 63:4, 78:2
**reading** [5] - 5:19,
79:15
**ready** [1] - 47:24
**real** [1] - 15:23
**realized** [1] - 55:17
**really** [5] - 28:4,
28:15, 40:2, 67:13,
74:19
**reason** [5] - 44:15,
51:6, 53:10, 53:12,
76:22
**reasonable** [4] -
43:8, 61:21, 61:22,
76:2
**recent** [1] - 64:17
**Recess** [1] - 37:5
**recheck** [1] - 66:16
**recognize** [1] - 17:11
**recollection** [1] -
14:23
**record** [11] - 4:11,
15:10, 15:23, 15:24,
15:25, 16:1, 37:4,
37:6, 46:7, 54:3,
77:19
**records** [34] - 13:18,
17:21, 18:1, 18:2,
18:6, 18:7, 18:8,
18:14, 18:19, 18:20,
18:22, 18:23, 19:9,
19:15, 19:21, 20:12,
20:14, 21:4, 21:6,
21:11, 34:23, 39:8,
42:1, 48:2, 48:8,
48:23, 60:4, 60:20,
60:21, 60:22, 62:7,
63:8, 64:8
**recovered** [2] -
19:24, 20:25
**reduced** [1] - 79:10
**refer** [1] - 29:6
**reference** [2] - 29:2,

69:3
**referred** [6] - 27:11,
30:18, 33:16, 52:12,
53:1, 53:3
**referring** [2] - 30:20,
38:21
**refers** [2] - 26:9, 33:7
**reflect** [2] - 28:19,
63:8, 64:8
**reflected** [4] - 30:4,
30:5, 30:7, 65:14
**reflection** [1] - 55:14
**refusing** [1] - 55:3
**regarding** [2] - 9:19,
10:3
**regards** [5] - 10:23,
18:20, 20:12, 21:3,
21:6
**registered** [1] -
39:16
**regular** [3] - 9:11,
62:9, 64:3
**regularly** [2] - 9:18,
9:20
**relate** [1] - 29:12
**related** [6] - 24:6,
27:8, 65:11, 65:19,
69:21, 69:22
**relates** [1] - 26:20
**relating** [1] - 21:1
**relations** [1] - 27:13
**relationship** [2] -
26:22, 28:9
**relationships** [3] -
25:20, 26:21, 57:9
**released** [1] - 35:2
**relevance** [1] - 19:21
**Relevance** [1] - 54:2
**relevant** [3] - 24:2,
51:8, 53:13
**relied** [2] - 50:12,
50:14
**rely** [2] - 41:25, 75:13
**remaining** [1] - 34:9
**remark** [1] - 50:6
**remember** [12] -
12:14, 14:19, 44:18,
60:20, 62:17, 67:25,
68:18, 70:10, 71:23,
71:25, 74:12, 74:15
**reminder** [3] - 59:18,
77:9, 77:15
**reminders** [2] -
58:22, 77:14
**remission** [3] -
75:20, 76:4, 76:15
**repeat** [1] - 29:22
**repeated** [1] - 29:8
**repeatedly** [1] - 37:8
**rephrase** [4] - 31:20,

31:25, 32:5, 32:6
**report** [31] - 13:18,
17:2, 17:8, 17:13,
17:19, 17:20, 27:15,
33:4, 33:6, 33:13,
42:6, 43:16, 43:20,
44:21, 44:23, 45:9,
46:3, 46:22, 46:25,
47:24, 48:16, 54:21,
61:2, 70:7, 70:9,
71:16, 73:3, 73:16,
74:14
**reported** [2] - 24:24,
25:3
**reports** [7] - 20:5,
42:1, 46:1, 50:10,
51:12, 54:19, 74:13
**represent** [1] - 11:7
**represents** [1] -
79:11
**request** [2] - 19:3,
19:5, 45:21
**required** [1] - 16:21
**research** [1] - 48:24
**resentment** [1] -
26:12
**residence** [1] - 22:25
**residency** [2] - 4:24,
5:3
**resident** [1] - 4:14
**respect** [1] - 20:20
**response** [5] - 19:2,
19:4, 24:16, 45:7,
46:20
**responsive** [1] -
18:13
**result** [9] - 5:1, 6:10,
6:14, 42:14, 47:10,
56:10, 68:16, 69:20,
74:8
**results** [1] - 74:23
**retain** [1] - 16:24
**retained** [3] - 10:15,
10:22, 16:12
**retardation** [1] -
23:22, 23:23, 26:9
**retire** [1] - 11:19
**retired** [2] - 12:25,
13:1
**return** [5] - 20:1,
21:2, 35:2, 60:7,
66:22
**returned** [5] - 27:24,
34:14, 48:2, 48:8,
70:25
**returning** [1] - 66:4
**review** [3] - 17:21,
18:6, 39:8
**reviewed** [9] - 18:2,
18:21, 18:23, 19:10,

19:15, 20:5, 21:4,
22:3, 48:21
**reviewing** [6] -
13:18, 21:8, 21:16,
22:7, 44:19, 62:7
**rights** [4] - 33:21,
34:2, 34:4, 74:1
**rise** [2] - 25:16,
35:16
**risk** [2] - 51:3, 51:4
**Room** [1] - 2:3
**room** [2] - 36:2, 40:5
**Rule** [1] - 79:18
**Rules** [2] - 1:13,
79:19

## S

**sac** [1] - 70:23
**safety** [2] - 50:8,
72:16
**satisfactory** [1] -
34:11
**saw** [3] - 30:1, 44:10,
56:22
**scarred** [1] - 77:8
**schizophrenia** [1] -
26:5
**School** [1] - 4:25
**school** [1] - 5:16
**SCHWEIGERT** [40] -
2:2, 11:4, 11:6, 15:15,
15:18, 15:21, 16:2,
16:7, 17:7, 18:12,
19:11, 19:17, 21:10,
21:18, 22:11, 22:17,
29:20, 31:19, 31:23,
32:2, 33:3, 33:8,
33:12, 37:2, 38:23,
43:14, 54:4, 54:15,
55:8, 56:8, 60:14,
61:6, 62:13, 64:11,
66:25, 67:4, 69:11,
74:20, 76:12, 77:17
**Schweigert** [3] - 3:6,
3:8, 11:3, 16:11,
16:22, 22:9
**scope** [2] - 33:4,
33:15
**scoring** [1] - 75:12
**scratch** [1] - 59:24
**search** [6] - 22:22,
22:23, 36:22, 37:13,
43:18, 44:1
**searched** [1] - 30:20
**second** [5] - 18:24,
35:20, 48:3, 48:4,
48:7
**secondary** [1] - 9:16
**section** [2] - 24:1,

24:8

**security** [1] - 36:21
**Security** [1] - 36:21
**see** [27] - 15:16, 27:24, 35:18, 43:19, 47:12, 47:25, 51:15, 53:17, 58:17, 61:7, 62:3, 62:14, 63:7, 63:10, 63:17, 63:18, 63:20, 64:12, 64:14, 64:18, 67:23, 68:14, 68:19, 69:16, 70:25, 75:25, 77:3
**seeing** [3] - 11:22, 42:6, 56:22
**seem** [7] - 19:24, 57:2, 58:15, 63:5, 66:23, 68:2, 71:5
**selected** [2] - 53:9, 53:10
**Semi** [1] - 13:1
**Semi-retired** [1] - 13:1
**seminars** [5] - 5:19, 9:1, 9:3, 9:4, 9:9
**send** [2] - 38:6, 47:24
**sense** [1] - 35:16
**sensitivity** [1] - 65:15
**sent** [3] - 17:15, 17:19, 45:21
**sentence** [1] - 70:22
**series** [1] - 49:12
**serve** [2] - 22:20, 25:6
**services** [1] - 16:25
**set** [1] - 60:10
**settings** [4] - 54:8, 54:14, 75:7, 75:8
**settle** [1] - 77:6
**several** [4] - 21:17, 32:12, 71:1, 71:11
**severe** [2] - 65:3, 65:4
**severely** [1] - 25:15
**severity** [1] - 35:17
**shake** [1] - 37:25
**shaking** [3] - 34:15, 38:9, 40:3
**shaky** [5] - 25:1, 25:2, 39:25, 59:11
**Shall** [1] - 32:4
**SHEILA** [3] - 1:16, 79:3, 79:23
**short** [1] - 26:7
**short-lived** [1] - 26:7
**shorthand** [1] - 79:9
**showed** [1] - 42:22
**shown** [1] - 67:22

**side** [1] - 36:9
**sign** [1] - 79:14
**signature** [1] - 79:15
**Signed** [1] - 78:10
**significance** [12] - 21:8, 40:21, 50:2, 50:4, 50:5, 51:12, 51:15, 55:5, 68:22, 71:15, 71:18, 71:21
**significant** [10] - 19:9, 19:15, 20:13, 22:14, 23:9, 24:2, 24:5, 25:13, 50:9, 52:22
**signing** [1] - 79:16
**silence** [3] - 53:24, 54:5, 54:7
**simplifying** [1] - 50:21
**sisters** [5] - 28:6, 29:13, 30:11, 31:9, 61:13
**sitting** [1] - 44:22
**situation** [3] - 37:22, 52:20, 59:21
**six** [2] - 10:20, 11:17
**sleep** [10] - 20:16, 20:19, 35:15, 56:1, 59:9, 63:12, 63:13, 69:4, 69:5, 69:8
**sleeping** [3] - 56:4, 68:24, 76:20
**sleepless** [1] - 27:21
**sleeplessness** [4] - 24:23, 62:19, 69:6, 76:23
**slight** [6] - 70:12, 70:17, 70:20, 71:6, 71:14, 72:9
**Slight** [1] - 70:13
**Society** [2] - 8:24, 8:25
**someone** [22] - 6:12, 6:15, 14:17, 14:19, 24:10, 25:14, 26:10, 27:23, 35:5, 40:10, 41:18, 42:5, 70:14, 70:24, 71:6, 71:12, 72:12, 74:2, 74:9, 76:7, 76:24, 77:1
**sometime** [1] - 25:6
**sometimes** [3] - 13:12, 45:5, 46:25
**Sometimes** [3] - 6:12, 6:15, 58:7
**somewhere** [1] - 21:23
**Somewhere** [1] - 58:4
**son** [48] - 22:21,

**24:6**, 24:19, 25:4, 27:2, 27:7, 27:18, 27:21, 27:24, 28:5, 28:14, 28:23, 29:19, 30:9, 31:6, 31:11, 32:10, 32:12, 35:25, 36:16, 36:24, 37:8, 37:11, 37:16, 38:3, 38:7, 39:20, 39:23, 40:17, 40:24, 42:12, 42:17, 42:19, 42:23, 43:4, 57:3, 57:4, 57:18, 61:2, 61:10, 61:17, 63:14, 63:15, 70:2, 70:25, 71:13, 72:17, 72:24
**son's** [2] - 27:3, 40:25
**son-in-law** [1] - 37:11
**SOP** [1] - 63:22
**Sorry** [1] - 54:6
**sorry** [7] - 32:3, 38:23, 49:1, 51:19, 59:5, 70:16, 72:19
**sounds** [1] - 70:11
**source** [3] - 22:9, 30:24, 33:15
**sources** [1] - 41:25
**South** [1] - 2:7
**special** [1] - 5:21
**specialty** [1] - 14:3
**specific** [7] - 27:15, 35:13, 61:16, 62:4, 64:23, 72:16, 74:7
**specifically** [1] - 20:20
**specifics** [1] - 74:12
**specified** [1] - 22:21
**spectrum** [1] - 5:25
**speculate** [1] - 76:19
**speculation** [11] - 22:12, 55:25, 61:5, 61:19, 61:21, 64:6, 67:3, 69:10, 76:11, 77:2, 77:7
**speech** [1] - 42:4
**SPENCER** [1] - 1:6
**Spencer** [1] - 19:7
**spend** [1] - 28:8
**Spends** [1] - 37:11
**spent** [3] - 13:17, 73:13, 73:14
**split** [2] - 18:18, 19:14
**spontaneously** [1] - 20:9
**spot** [1] - 60:1
**SS** [1] - 79:1
**staff** [1] - 20:9

**Stafford** [1] - 19:7
**stand** [1] - 6:20
**standards** [1] - 65:15
**stands** [2] - 63:21, 65:25
**start** [2] - 43:17, 48:7
**started** [2] - 7:5, 11:19
**starting** [1] - 38:23
**startled** [1] - 36:5
**startles** [1] - 75:24
**Startles** [1] - 76:7
**STATE** [1] - 79:1
**state** [5] - 4:10, 5:8, 5:11, 5:15, 7:23
**State** [3] - 1:16, 79:4, 79:24
**statement** [7] - 27:16, 31:10, 36:19, 38:19, 51:3, 54:24, 71:16
**statements** [10] - 20:22, 30:6, 30:7, 30:22, 48:21, 57:2, 57:5, 70:14, 71:6, 71:24
**STATES** [1] - 1:1
**stating** [1] - 22:19
**station** [2] - 72:25, 73:2
**status** [2] - 17:23, 72:17
**stay** [8] - 20:24, 55:20, 55:23, 63:1, 66:7, 66:21, 67:17, 67:18
**stayed** [2] - 63:2, 68:5
**staying** [3] - 31:6, 35:4, 68:1
**stays** [1] - 67:22
**step** [2] - 8:10, 55:10
**Steven** [1] - 18:9
**stick** [1] - 72:4
**still** [14] - 5:13, 11:10, 11:20, 13:7, 15:12, 39:22, 55:2, 58:17, 65:21, 68:23, 70:8, 70:17, 76:13, 77:1
**stipulation** [1] - 79:16
**stop** [3] - 16:3, 39:3, 39:4
**stopped** [1] - 55:11
**strain** [1] - 55:12
**strange** [3] - 70:21, 70:22, 72:15
**strangers** [1] - 72:14
**Street** [5] - 1:11,

1:19, 2:2, 2:7, 4:13
**stress** [2] - 9:25, 30:24
**stresses** [2] - 24:4, 24:11
**stressful** [1] - 24:22
**stressor** [1] - 73:9
**strict** [1] - 35:16
**Strike** [1] - 35:9
**struck** [2] - 21:25, 22:5
**study** [2] - 5:3, 5:20
**studying** [1] - 5:18
**sub** [1] - 14:3
**sub-specialty** [1] - 14:3
**subclinical** [1] - 14:10
**subspecialties** [1] - 14:8
**sued** [1] - 12:13
**suffer** [2] - 34:5, 56:10
**suffered** [3] - 56:15, 64:2, 69:20
**suffering** [10] - 7:9, 34:1, 34:16, 35:6, 58:17, 58:23, 59:8, 64:15, 64:18, 76:4
**sufficiently** [1] - 20:23
**suggesting** [2] - 52:18, 62:20
**suing** [1] - 74:10
**Suite** [3] - 1:12, 1:19, 4:13
**summary** [1] - 62:24
**supervision** [1] - 79:10
**support** [1] - 35:14
**Suppose** [1] - 76:6
**surprised** [2] - 72:7, 72:8
**SWAT** [3] - 22:23, 50:7, 51:4
**sworn** [2] - 4:5, 79:8
**symptom** [2] - 24:11, 25:5
**symptomatology** [1] - 19:25
**symptoms** [7] - 24:12, 24:23, 34:17, 55:23, 56:1, 63:4, 63:16
**system** [4] - 7:24, 20:11, 75:12, 75:13

## T

**talks** [2] - 33:8, 58:18

**task** [1] - 60:17
**team** [3] - 22:24, 50:7, 51:4
**telephone** [3] - 14:18, 14:24, 79:14
**television** [2] - 36:1
**temper** [1] - 46:11
**temperament** [2] - 30:2, 65:13
**ten** [3] - 11:15, 11:24, 73:15
**tend** [1] - 26:11
**tendency** [1] - 68:11
**tense** [1] - 25:1
**term** [5] - 14:4, 14:11, 25:8, 25:11, 53:24
**terminology** [1] - 25:9
**terms** [13] - 18:19, 21:3, 22:2, 23:2, 24:13, 25:25, 28:25, 32:12, 43:1, 44:11, 50:15, 51:15
**test** [2] - 75:4, 75:6
**testamentary** [1] - 6:19
**testified** [5] - 4:5, 8:1, 8:14, 8:15, 8:17
**testifying** [1] - 53:21
**testimony** [9] - 8:6, 13:14, 15:19, 44:4, 44:17, 46:11, 54:17, 73:10, 78:4
**testing** [2] - 17:25, 30:5
**THE** [22] - 1:1, 1:2, 15:16, 15:24, 16:1, 16:6, 17:8, 18:16, 21:23, 22:13, 22:19, 29:22, 32:4, 33:16, 37:4, 37:6, 37:7, 54:7, 56:1, 64:8, 76:19, 77:19
**themselves** [2] - 40:8, 40:13, 44:1, 51:3, 52:25
**thereafter** [1] - 79:10
**therefore** [3] - 33:4, 46:4, 79:18
**thinking** [2] - 38:17, 56:5
**thinks** [2] - 63:1, 77:12
**third** [4] - 19:1, 36:12, 45:10, 56:14
**thoughts** [1] - 25:1
**threatened** [1] - 6:16
**three** [16] - 11:1, 20:24, 34:7, 34:8,

**34:21, 34:24, 40:4,** 44:7, 44:11, 46:19, 62:21, 63:2, 64:13, 67:23, 68:1, 73:14
**throughout** [1] - 52:11
**titles** [1] - 10:5
**today** [5] - 43:8, 46:2, 46:16, 73:15, 76:16
**together** [2] - 28:7, 54:9
**tone** [3] - 27:11, 41:11, 42:3
**took** [3] - 4:22, 4:24, 34:3
**top** [2] - 33:17, 57:4
**topics** [2] - 9:5, 9:25
**totally** [2] - 76:10, 76:15
**toward** [2] - 7:7
**town** [1] - 72:25
**training** [1] - 5:17
**transcribed** [1] - 45:3
**transcript** [2] - 78:4, 79:12
**trauma** [1] - 74:8
**traumatic** [1] - 77:11
**traumatized** [1] - 68:8
**treat** [7] - 5:24, 11:10, 12:23, 13:21, 13:24, 62:6, 69:13
**treated** [1] - 65:6
**treating** [3] - 7:2, 7:8, 11:11
**treatment** [10] - 9:5, 16:21, 35:12, 35:14, 47:6, 58:6, 60:25, 62:9, 63:5, 63:7
**trial** [2] - 6:20, 15:19
**trouble** [2] - 37:17, 38:14, 38:16, 61:16, 76:13, 76:15, 76:20
**troubled** [1] - 20:18
**true** [2] - 41:17, 78:4
**truthful** [1] - 49:24
**try** [3] - 22:17, 42:5, 46:13
**trying** [2] - 41:4, 46:15
**Turbin** [1] - 12:12
**turn** [1] - 11:2
**two** [32] - 11:1, 13:6, 16:16, 18:19, 19:14, 19:22, 30:22, 31:3, 36:8, 36:10, 43:24, 43:25, 47:25, 48:2, 48:8, 55:11, 57:21,

**57:25, 58:3, 58:8,** 58:15, 58:16, 60:7, 61:4, 64:13, 66:10, 66:13, 72:21, 73:14, 74:16
**type** [5] - 7:12, 9:3, 41:23, 74:5, 74:6
**typewriting** [1] - 79:10
**typewritten** [1] - 78:2

## U

**unable** [1] - 34:14
**uncomfortable** [1] - 31:10
**unconscious** [1] - 41:14
**under** [3] - 66:19, 77:12, 79:10
**undergraduate** [1] - 4:19
**understood** [1] - 16:18
**unhappy** [1] - 40:12
**uninvited** [2] - 23:5, 53:17
**UNITED** [1] - 1:1
**University** [2] - 4:20, 75:10
**unless** [3] - 22:23, 24:11, 41:21
**unpleasant** [2] - 58:22, 59:20
**unreasonable** [1] - 68:2
**up** [22] - 6:16, 14:24, 16:4, 18:18, 19:14, 31:6, 40:14, 45:6, 46:21, 49:25, 52:9, 54:23, 55:20, 58:10, 61:4, 61:10, 62:7, 65:1, 67:10, 71:6, 73:10, 75:1
**upset** [5] - 38:9, 40:25, 41:1, 42:14, 49:21, 55:13, 58:20, 59:1, 59:4, 59:15, 68:9, 68:12, 70:21, 77:6, 77:15
**upsetting** [3] - 42:18, 61:15, 65:18
**uses** [1] - 75:9
**usual** [1] - 72:13

## V

**Vague** [1] - 55:7
**vague** [2] - 19:12, 19:18
**valium** [12] - 62:1,

**62:3, 63:10, 64:21,** 65:22, 68:15, 68:20, 69:4, 69:7, 69:9, 69:13, 69:17
**values** [1] - 20:11
**variation** [1] - 75:16
**varied** [1] - 5:23
**variety** [6] - 5:24, 6:21, 9:16, 17:25, 22:6, 54:14
**various** [7] - 14:7, 18:10, 26:1, 26:20, 33:7, 34:17, 48:21
**vary** [1] - 9:4
**versus** [1] - 46:19
**veteran** [1] - 77:11
**Videographer** [1] - 2:9
**VIDEOGRAPHER** [5] - 15:24, 16:1, 37:4, 37:6, 77:19
**Vietnam** [1] - 77:12
**view** [3] - 26:15, 55:23, 61:4
**viewed** [1] - 20:23
**violated** [2] - 33:21, 34:4
**visit** [2] - 64:19, 65:22
**vitae** [1] - 10:4
**vividness** [1] - 58:15
**voice** [2] - 41:11, 57:6
**voices** [1] - 27:11
**voir** [3] - 11:3, 15:13, 16:3
**Voir** [1] - 3:8
**VOIR** [1] - 11:5
**voluminous** [1] - 45:1
**vs** [1] - 1:5

## W

**Wackenhut** [1] - 36:21
**wait** [1] - 32:4
**waived** [1] - 79:16
**waking** [1] - 71:6
**wants** [5] - 34:2, 34:3, 67:17, 67:18, 68:6
**warrant** [15] - 22:21, 22:22, 22:23, 25:6, 27:3, 28:7, 29:19, 32:18, 36:18, 36:22, 36:25, 38:19, 40:24, 42:15, 73:1
**watching** [5] - 27:23, 36:1, 70:14, 70:25,

**71:7**
**water** [1] - 37:25
**waterfront** [1] - 54:12
**week** [8] - 13:5, 28:8, 55:11, 66:8, 66:21, 66:22, 67:17, 67:19
**weekly** [1] - 13:5
**weeks** [13] - 20:24, 34:7, 34:8, 34:21, 34:25, 47:25, 48:3, 48:9, 60:7, 66:10, 66:13, 67:23, 68:1
**welcome** [1] - 46:5
**Whereas** [1] - 40:17
**whole** [4] - 23:11, 41:13, 46:14, 59:19
**widely** [2] - 75:6, 75:17
**WILLIAM** [1] - 1:6
**William** [3] - 19:2, 19:4, 19:6
**willing** [2] - 12:15, 72:6
**wishes** [1] - 16:24
**witness** [3] - 4:4, 46:9, 79:6
**WITNESS** [15] - 15:16, 16:6, 17:8, 18:16, 21:23, 22:13, 22:19, 29:22, 32:4, 33:16, 37:7, 54:7, 56:1, 64:8, 76:19
**Witness** [2] - 57:14, 69:25
**woman** [3] - 72:5, 72:8, 72:11
**word** [2] - 33:13, 55:16
**words** [10] - 21:21, 30:19, 46:25, 51:11, 51:16, 51:22, 51:25, 53:4, 63:19, 71:7
**workers** [1] - 20:9
**Workers'** [1] - 74:6
**workload** [2] - 11:15, 11:17
**workshops** [1] - 5:19
**world** [2] - 72:1, 75:6
**worried** [13] - 27:18, 28:12, 28:13, 32:10, 39:19, 39:22, 39:23, 40:16, 42:11, 56:2, 70:11, 70:12, 72:2
**worry** [4] - 25:4, 31:6, 34:13, 68:12
**worrying** [2] - 27:21, 31:6
**write** [4] - 17:2, 17:13, 43:16, 46:24

**writing** [6] - 44:21, 46:1, 47:16, 66:19, 66:22, 67:7
**written** [4] - 9:22, 9:24, 47:21
**wrote** [2] - 17:14, 21:22

## Y

**Yale** [1] - 4:19
**year** [5] - 12:24, 13:3, 39:17, 71:3, 71:4
**years** [17] - 5:18, 5:23, 6:24, 7:6, 10:21, 11:16, 11:17, 11:24, 12:13, 12:19, 58:3, 58:8, 58:16, 61:4, 72:21, 73:23, 76:20
**yesterday** [1] - 58:9
**York** [1] - 4:22
**yourself** [3] - 12:24, 18:3, 40:10